750 N.E.2d 832 (2001)
In the Matter of the Termination of the Parent Child Relationship of K.S, D.S., B.G., J.K, Minor Children, and Connie Schultz, a/k/a Connie Karreman, the Children's Mother,
Connie Schultz, Appellant,
v.
The Porter County Office of Family and Children, Appellee.
No. 64A03-0012-JV-429.
Court of Appeals of Indiana.
June 20, 2001.
*834 Bryan M. Truitt, Tsoutsouris & Bertig, Valparaiso, IN, Attorney for Appellant.
Theodore A. Fitzgerald, Petry & Fitzgerald, Hebron, IN, Attorney for Appellee.

*833 OPINION
MATHIAS, Judge.
Appellant-Respondent Connie Schultz ("Mother") appeals the decision of the trial court terminating her parental rights with regard to K.S., age fourteen, D.S., age thirteen, B.G., age ten, and J.K., age four, upon petition by the Porter County Office of Family and Children ("OFC"). Mother presents for review the sole issue of whether there is sufficient evidence to support the termination of her parental rights.[1]
We affirm.

*835 Facts and Procedural History
OFC first became involved with Mother and her children on January 28, 1993. OFC caseworker Louella Richey ("Richey") testified that her investigation of Mother's residence at that time revealed that the yard resembled a "junkyard" and the interior of the house was "filthy." R. at 123. The children were also dirty. The youngest child had a black eye, reportedly from playing in the "junk yard." R. at 124. Kerosene and space heaters provided the sole heat in the residence. Richey removed K.S., D.S. and B.G. from Mother's residence.[2] A detention hearing was held on February 1, 1993, and the court ordered the provision of homemaking services to Mother.
With assistance, Mother improved her housekeeping and the children were returned to her during June 1993. Carol Yokshas ("Yokshas"), a provider of homemaker services, documented the condition of the residence from May 1993 through September 1993, and opined that it met "minimum standards" for cleanliness. R. at 188-212. However, Yokshas perceived that Mother and the children had personal hygiene problems. According to the testimony of caseworker Melanie Yagelski ("Yagelski"), the condition of the residence deteriorated.
In response to a report of neglect, OFC case manager Eileen Walters ("Walters") attempted to conduct a home visit on July 21, 1994, but Mother and the children were not at home. The outside of the residence was filthy, and odors emanated from the interior of the house. Walters obtained a detention order, but the children were not taken into OFC custody because Mother and the children had fled to Michigan. Mother returned to Indiana during 1995 and moved into a new modular home.
On June 21, 1995, Mother entered into a service agreement with OFC, and OFC made a second homemaker referral. Family case manager Chuck Barnett testified that the interior of Mother's residence was maintained at a "minimally sufficient level" of cleanliness during the six-month agreement period, although he observed steady deterioration of housekeeping standards. R. at 225.
On August 6, 1997, Richey returned to Mother's residence in response to a report that the home was uninhabitable. Upon gaining entry to the home, Richey observed numerous dogs in the master bedroom/master bathroom area.[3] The room was covered with animal feces and garbage. J.K., then an infant, appeared to be underweight and covered with flea bites.[4] *836 Richey removed the four children from the residence. Family case manager Marc Brown ("Brown") was assigned to work with Mother in reunification efforts. The animals were removed, the carpeting was cleaned, and Mother was able to attain minimally adequate standards of housekeeping. The children were returned to Mother during June 1998.
Mother and the children moved to Francesville, Indiana. Initially, the new home was reasonably well-kept. However, the condition of the home once again deteriorated, and Mother stopped keeping appointments with service providers. Brown observed animal feces on the floor of Mother's residence. When he visited the older three children at school, Brown discovered that they "smelled badly." R. at 236. Brown opined that D.S. was depressed, and the children were generally ostracized and tormented at school because they were unclean. Brown described the situation as one where "I couldn't really stand to be in the same room with them." R. at 236. On April 15, 1999, the children were again removed from Mother's custody. Brown's last visit to Mother's home was made during March 2000, when he found the appearance of the residence to be "better" and things "picked up." R. at 249. He observed no animals at the residence.
On January 4, 2000, OFC filed a petition to terminate the parent-child relationships of Mother and the respective fathers of K.S., D.S., B.G., J.K. A hearing was held on June 6 and 8, 2000. The fathers appeared, and each agreed to the termination of his parental rights. Mother appeared and opposed the termination of her parental rights. A foster parent of K.S. and D.S. and a foster parent of B.G. and J.K. testified; each expressed a desire to adopt their foster children. On June 28, 2000, the trial court issued an order terminating Mother's parental rights. Mother filed a Motion to Correct Error, which was summarily denied. Mother now appeals.

Discussion and Decision
This court has long had a highly deferential standard of review in cases concerning the termination of parental rights. Parental rights are of a constitutional dimension, but the law provides for the termination of those rights when the parents are unable or unwilling to meet their parental responsibilities. In re L.S., 717 N.E.2d 204, 208 (Ind.Ct.App.1999), trans. denied. The purpose of terminating parental rights is not to punish the parents, but to protect their children. Id. We will not set aside the trial court's judgment terminating a parent-child relationship unless it is clearly erroneous. Egly v. Blackford Cnty. DPW, 592 N.E.2d 1232, 1234-35 (Ind.1992). In determining whether the evidence is sufficient to support the judgment terminating parental rights, this court neither reweighs the evidence nor judges the credibility of witnesses. Id. at 1235. We consider only the evidence that supports the judgment and the reasonable inferences to be drawn there from. Id. Findings of fact are clearly erroneous only when the record lacks any evidence or reasonable inferences to support them. Crowley v. Crowley, 708 N.E.2d 42, 54 (Ind.Ct.App.1999).
In order to terminate a parent-child relationship, OFC must allege and prove by clear and convincing evidence that:
(A) [o]ne (1) of the following exists:
(i) the child has been removed from the parent for at least six (6) months under a dispositional decree;
(ii) a court has entered a finding under IC XX-XX-XX-X.6 that reasonable efforts for family preservation *837 or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made; or
(iii) after July 1, 1999, the child has been removed from the parent and has been under the supervision of a county office of family and children for at least fifteen (15) months of the most recent twenty-two (22) months;
(B) there is a reasonable probability that:
(i) the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied; or
(ii) the continuation of the parent-child relationship poses a threat to the well-being of the child;
(C) termination is in the best interests of the child; and
(D) there is a satisfactory plan for the care and treatment of the child.
Ind.Code § 31-35-2-4(b)(emphasis supplied). The trial court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding the termination. In re A.A.C., 682 N.E.2d 542, 544 (Ind.Ct. App.1997). Termination of a parent-child relationship is proper where the child's emotional and physical development is threatened. Egly, 592 N.E.2d at 1234. However, the right of parents to raise their children should not be terminated solely because there is a better home available for the children. In re V.A., 632 N.E.2d 752, 756 (Ind.Ct.App.1994).
Mother contends that OFC presented insufficient evidence to support the termination of her parental rights. Specifically, she argues that OFC failed to prove by clear and convincing evidence that there is a reasonable probability that the conditions which resulted in her children's removal will not be remedied.
In determining whether the conditions that led to the children's removal from the home are likely to be remedied, the trial court must assess a parent's ability to care for her children as of the date of the termination proceeding and take into account any evidence of changed conditions. See In re B.D.J., 728 N.E.2d 195, 201 (Ind.Ct.App.2000). However, the trial court should also take into account the parent's habitual patterns of conduct as a means of determining the probability of future detrimental behavior, as well as the services offered by OFC to the parent and the parent's response to those services. Id. at 200-01. The involuntary termination of parental rights is an extreme measure that is designed to be used only as a last resort when all other reasonable efforts have failed. Id. at 199.
Here, the trial court entered an eleven page order of extraordinarily detailed and well-supported findings and conclusions. For example, after describing OFC's prior removal of the children due to squalid conditions in 1993, 1994 and 1997, the trial court found that:
[t]he Office of Family and Children, the CASA, and this Court, have made repeated, sincere attempts to facilitate the preservation of this family. The children's mother has made repeated efforts to provide her children with a safe, sanitary and suitable home. She has, in fact, demonstrated the ability to do so for periods of time. She has made attempts to control her depression which apparently is the root of her difficulties in properly caring for her home and her children. She has been nurtured, counseled, medicated, taught, encouraged, and threatened with termination of parental *838 rights in an effort to achieve the common goal of all the parties to this proceeding, reunification and/or preservation of this family. Despite all efforts, the problems which continue to plague the mother and her children inevitably and invariably return. More accurately, the problems never go away, but the mother continues to lose her well-intentioned battles to control them. This court has not the slightest doubt that the conditions that have resulted in removal of these children on numerous occasions will never be remedied.
R. at 42. The trial court's finding is supported by the record and is therefore entitled to considerable deference by this Court, not the de novo review suggested by the dissent. In re L.S., 717 N.E.2d at 208.
The trial court also made independent findings on the alternative statutory ground that continuation of the parent-child relationship poses a threat to the children's well-being. Ind.Code § 31-35-2-4(b)(2). The trial court found that:
[T]his is not merely a "dirty house" case. We are not dealing with children whose parents are poor, and whose housekeeping standards do not meet with the haughty expectations of more affluent neighbors. Rather, this is a case where the children are treated only slightly better than the malnourished, flea-bitten, diseased, feces-matted animals which are routinely found sharing their home. While these children love their mother, are bonded to her, and recognize her love for them, they are nevertheless time after time physically and psychologically harmed by her inability to overcome her personal demons that keep her from translating her feelings of love into substantial, long-lasting actions of love....
The children have immediate needs for permanency and stability which their parents continue to be unable to provide for them, and which has been and will continue to be provided in an adoptive placement. It is in their best interests to grow up in a clean, safe, secure, and stable environment, free of piles of junk and garbage, free of stench of excrement, free of maltreated, diseased, flea-infested animals, free of being ushered out of their home, their school and their community, with their names or appearances changed in order to stay one step ahead of the next CPS investigation, free of fathers who could not possibly care less about them or their best interests, free of being bounced back and forth between their mother and foster care placement, free of fear that the next foster care placement may not be a good one or allow sufficient contact with siblings, free of anger, fear and humiliation at being social outcasts, and free of interminable wait for their mother to finally "succeed", and the torturous uncertainly of not knowing what will happen to them tomorrow, next week, next month, next year.
R.at 42-44.
Thus, the trial court found not only lack of remediation as grounds to terminate; it also entered findings and conclusions clearly showing that the continuation of the parent-child relationship poses a threat to the well-being of the children.[5] Either of these elements is sufficient to make termination appropriate.
This is a difficult case because it turns on whether there is ever a situation in *839 which the parent-child relationship can and should be terminated due to the abjectly filthy conditions in which a parent repeatedly chooses to raise his or her child. We regretfully conclude that the trial court's comprehensive findings and conclusions show this is just such a rare case. Mother was clearly entitled to a second chance in 1993, but not a fourth chance in 2000.
Affirmed.
BAKER, J., concurs.
BAILEY, J., dissents with separate opinion.
BAILEY, Judge, dissenting.
I respectfully dissent. The majority observes that the trial court entered findings and conclusions that are "extraordinarily detailed and well-supported," 750 N.E.2d at 837, and then leaps to the conclusion that lengthy and articulate findings having some basis in fact necessarily establish the requisite clear and convincing evidence to support the termination of parental rights. However, the findings and conclusions lack reference to any discernable evidence of causal connection between the conditions of the residence and any imminent harm to the children.
The trial court must assess the parent's ability to care for her children as of the date of the termination proceeding, taking into account evidence of changed conditions. See In re B.D.J., 728 N.E.2d 195, 201 (Ind.Ct.App.2000). Here, the trial court issued findings which purportedly support its termination order on either of two alternative grounds, specifically, there is a reasonable probability that the conditions that resulted in removal will not be remedied or the continuation of the parent-child relationship poses a threat to the well-being of the children.
Nevertheless, it is clear that the trial court did not judge Mother's parental ability as of the date of the termination proceeding, as it totally failed to consider the uncontroverted evidence of remediation of the sole condition alleged by the OFC to have prompted the children's removal; namely, a lack of cleanliness. The OFC alleged that a lack of cleanliness prompted the children's removal. Mother has consistently provided her children with food, clothing and shelter. She has a stable source of income. There have been no allegations of physical or sexual abuse. Since their placement in foster care, Mother has consistently maintained contact with her children. She has substantially complied, albeit with less than optimal and permanent results in the area of homemaking, with previous dispositional orders. Mother has sought long-term therapy for her depression. OFC caseworkers and Mother's therapist uniformly testified that a parent-child bond exists between Mother and her children. Thus, the sole condition that the OFC sought to remedy is inadequate personal and household cleanliness.
As the majority points out, the squalid conditions present in 1993, 1994 and 1997 were addressed in the trial court's findings. These findings have evidentiary support. Arguably, the OFC might have sought termination of parental rights in 1993, 1994 or 1997. However, in 2000, the home was "suitable for children" in the opinion of OFC case manager Marc Brown. R. at 253. He testified that the photographs of the home submitted by Mother at the termination hearing (depicting a clean home) fairly represented its condition upon his last inspection. Mother testified that she no longer kept any animals in her home. There is no evidence to the contrary. Accordingly, the trial court's conclusion that the condition prompting removal "will never be remedied" is clearly erroneous. R. at 42.
*840 Likewise, the trial court's conclusion that the continuation of the parent-child relationship poses a threat to the children is clearly erroneous because it lacks evidentiary support. In the guise of findings and conclusions D(1)-(2), identified by the trial court as supporting this basis for termination, and cited approvingly by the majority, the trial court issued nothing more than an emotionally appealing statement of social goals. I certainly do not challenge the proposition that children, all children, deserve to live in a clean home with loving parents. However, we, as judges, do not fulfill our function by merely rubber-stamping the placement of four children in presumably optimal homes (in this case, two separate adoptive homes) absent clear and convincing evidence on each element of Indiana Code section 31-35-2-4(b). We are charged with resolving all cases, and particularly those of a Constitutional dimension, based upon facts properly proven in court and not by resort to our personal norms or subjective opinions.
While the majority is content to make the leap of faith that an unclean house is causally connected to D.S.'s problems, absent admissible evidence to that effect, I cannot follow their lead. The record discloses that D.S. has twice received in-patient mental health services "because of his behavior." R. at 235. The precipitating events were instances where D.S. struck Mother. Additionally, Marc Brown offered a lay opinion that D.S. was depressed when Brown visited him at school. However, the record does not disclose a clinical diagnosis of depression or other mental illness. Moreover, the OFC did not present testimony, expert or otherwise, which establishes a nexus between D.S.'s mental health problems, if any, and an unsanitary home.
Lacking a causal connection, the trial court essentially penalizes Mother for seeking mental health services for D.S. although an entire mental health industry provides treatment for anger management and depression. If this Court holds that the trial court was entitled to conclude without proof that a parent who seeks mental health care for her child has also caused the underlying problem or condition, use of community mental health facilities will be greatly discouraged and the problems of the family will once again be cloaked in secrecy because of the threat of termination. The OFC postulated, with conjecture and leaps of logic, that D.S.'s problems were directly attributable to a lack of cleanliness, and this proposition was adopted both by the trial court and the majority. Taking to its logical extreme the premise that aggression and depression are rooted in filth, the OFC should discourage families from relying upon relatively expensive therapy and medication and encourage them to instead procure housekeeping services.
Moreover, assuming that we may presume from the conclusory statement of a caseworker that a lack of cleanliness harmed D.S. by causing his depression, the record is nevertheless void of a causal connection between the condition of the house and verifiable harm to the other three children.[6]
Additionally, I am not persuaded that the OFC presented clear and convincing evidence of a satisfactory plan for the care *841 and treatment of the children. The OFC proposes that the children, who have bonded with Mother and with each other over many years, be adopted into two separate households. Curiously, the trial court's findings and conclusions are silent as to the potential for traumatic psychological effects resulting from the separate adoptions of the siblings. The practical effect of the termination order is this: the parent-child bond between Mother and four children is legally ended.[7] Each child, who formerly had three siblings each, is to be adopted into a home with one biological sibling. Additionally, the children would be denied the continuation of their relationships with their maternal grandmother and maternal aunt, who were significantly involved in their lives prior to the termination order.
Finally, I question the absence of OFC efforts directly involving the children (three of whom are teenagers or pre-teen) in reaching the goal of personal cleanliness. The involuntary termination of parental rights is an extreme measure that is designed to be used only as a last resort when all other reasonable efforts have failed. In re B.D.J., 728 N.E.2d 195, 199 (Ind.Ct.App.2000). Here, there is no evidence that the caseworkers or homemakers offered any instruction directly to the children. Dr. Gerard Ahlers testified that the children are "polite, respectful, moral, nondemanding and intelligent." R. at 504. Presumably, they could cooperate with homemaker services and benefit therefrom. In light of the constitutional magnitude of parental rights, it was incumbent on the OFC to explore all reasonable alternatives to terminating parent-child relationships of lengthy duration and substituting separate adoptive relationships.
Regardless of the breadth of the purported findings and conclusions, termination of parental rights cannot be sustained on the basis of speculation and self-determination of social norms. Children are not to be removed from the home of the natural parent because there is a "better" place for them. In re T.C., 630 N.E.2d 1368, 1373 (Ind.Ct.App. 1994). Aspirational goals such as those expressed by the trial court and echoed in the majority opinion, however worthy they may be, do not substitute for admissible evidence amounting to clear and convincing proof on each requisite statutory element to support the termination of parental rights. Accordingly, I would reverse the termination judgment.
NOTES
[1] Mother also raises an additional issue concerning an alleged violation of her due process rights because of the trial court's non-compliance with statutory requirements governing pre-termination proceedings; specifically: a permanency hearing, case plan and dispositional order. However, this allegation of error is waived because a party may not raise an issue for the first time on appeal. Burton v. Estate of Davis, 730 N.E.2d 800, 805 n. 4 (Ind.Ct.App.2000). Likewise, OFC alleges that, at an undetermined time, a trial court employee modified the cause number on a praecipe filed by Mother because Mother referenced an incorrect cause number. Absent evidentiary support and citation to controlling authority to support the allegation of error, this Court will not address the allegation. Indiana Appellate Rule 8.3(A)(7).
[2] J.K. had not yet been born.
[3] Mother testified that her ex-husband, Robert Karreman, kept as many as 28 dogs in the family residence, and that some of the dogs were sickly, abandoned animals that the couple was attempting to nurse back to health. As of the time of the termination hearing, Mother was divorced from Karreman and he no longer resided in the family residence.
[4] Richey theorized that the infant's low weight was a result of being fed milk rather than infant formula. However, OFC did not allege that the children were inadequately fed, or that Mother's home did not contain an adequate supply of food.
[5] Indeed, the trial court's findings disclose that as of the last removal, D.S., now thirteen years old had been twice hospitalized, was depressed and was placed on probation for battering Mother.
[6] Dr. Caryn Brown, B.G.'s therapist, testified that B.G. exhibited anxiety, stress and concern about "the outcome of the proceedings." R. at 489. However, Dr. Brown testified that she did not speak with B.G. about any past hygiene problems B.G. may have experienced and that she and B.G. discussed the condition of the house "only in a peripheral way." R. at 490.
[7] The two living fathers are not parties to this appeal. Each appeared at the termination hearing and moved to voluntarily relinquish his parental rights. The trial court took the motions under advisement, pending the "conclusion of evidence in the remaining portions of the case." R. at 109. Prior to the termination order, the father of K.S. and D.S. paid child support through a wage assignment.