**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Nov 18 2013, 5:36 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**AMY KAROZOS**
Greenwood, Indiana

ATTORNEYS FOR APPELLEE:

**ROBERT J. HENKE**
Office of the Attorney General
Indianapolis, Indiana

**PATRICK M. RHODES**
Indiana Department of Child Services
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

IN THE MATTER OF THE TERMINATION OF )
THE PARENT-CHILD RELATIONSHIP OF K.H.: )
 )
E.H., )
 )
  Appellant-Respondent, )
 )
   vs. )  No. 49A02-1304-JT-310
 )
INDIANA DEPARTMENT OF CHILD SERVICES, )
 )
  Appellee-Petitioner. )

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Marilyn A. Moores, Judge
The Honorable Larry Bradley, Magistrate
Cause No. 49D09-1209-JT-36774

**November 18, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**NAJAM, Judge**

## STATEMENT OF THE CASE

E.H. ("Father") appeals the trial court's termination of his parental rights over his minor child, K.H. Father raises a single dispositive issue for our review, namely, whether the trial court's conclusion that continuation of the parent-child relationship poses a threat to K.H. is clearly erroneous.

We affirm.

## FACTS AND PROCEDURAL HISTORY

W.G. ("Mother") gave birth to K.H. on September 23, 2003. Father and Mother were not married, and paternity of K.H. was not established. K.H. lived with Mother until she moved to Michigan in approximately 2008. At that time, Mother left K.H. in the care of his maternal grandmother. On December 3, 2008, the Indiana Department of Child Services ("DCS") filed a petition alleging that K.H. was a child in need of services ("CHINS").[1] In particular, the DCS alleged that Mother was unable to care for K.H. and that "there is no one else with legal responsibility that is able and willing to care for the child." Petitioner's Exh. 1. The petition also stated that "[t]he alleged father of [K.H.] is [E.H.] [E.H.] has not come forward to successfully demonstrate to the DCS the ability or willingness to appropriately parent his child. He recently got out of jail for a possession of cocaine charge, and he has not established paternity." Id. The trial court ordered that K.H. be placed with a relative until March 2009, when DCS placed K.H. with Father.

On October 26, 2011, DCS filed a petition alleging K.H. to be a CHINS and stated in relevant part:

---

[1] K.H.'s maternal grandmother "failed to ensure that [K.H.] attended all of his medical appointments and . . . has a history with the DCS for neglect." Petitioner's Exh. 1.

2

On or about October 26, 2011, the [DCS] determined, by its Family Case Manager (FCM) Mary Thomas, the child to be in need of services because his father, [E.H.], has failed to provide the child with a safe and appropriate living environment free from excessive physical discipline. The child reported that his father hit him with a belt and his hands, and [E.H.] admitted to the police officer that he was "tired of the same trouble at school and lost it." The child was seriously injured due to the use of excessive physical discipline by his father, and [K.H.] required medical attention as a result. [E.H.] was arrested and incarcerated following the incident and has stated regarding the child's injuries that "they are just bruises, they will go away in a few days." Due to the seriousness of the injuries the child sustained from his father and [E.H.]'s arrest and incarceration as a result, the coercive intervention of the Court is necessary to ensure the child's safety and well[-]being.

The mother of the child is [W.G.] [W.G.] had previously been informed by the child that [E.H.] was hitting him, but she failed to take necessary action to protect the child from further abuse.

Petitioner's Exh. 13.

On January 30, 2012, Father admitted to the allegations in the CHINS petition during a factfinding hearing, and the trial court issued its dispositional order and parental participation order the same day. The trial court ordered that K.H. would continue his placement with an uncle, and the court ordered Father to: contact the family case manager ("FCM") every week; notify the FCM of changes in address, household composition, and employment; notify the FCM of any arrest or criminal charges within five days; maintain suitable, safe and stable housing; secure and maintain a legal and stable source of income; participate in home-based counseling; while incarcerated, participate in stress management classes, anger control, and parenting education classes; and, upon his release from incarceration, participate in a father's engagement program. On April 30, 2012, the trial court modified the dispositional order and ordered Father to: complete a mental health assessment and follow all recommendations; participate in a

fatherhood engagement program; undergo up to five random drug screens; and participate in a substance abuse assessment and follow all recommendations if Father failed a drug screen. The trial court also entered a decree establishing Father's paternity of K.H.

In the meantime, in March, Father pleaded guilty to battery, as a Class B felony. The criminal court sentenced Father to ten years, with six years executed and four years suspended. Father was initially placed on work release, but in August 2012, he violated the terms of that placement and was placed with the Department of Correction.

On September 19, the DCS filed a petition to terminate Father's parental rights to K.H. The trial court held an evidentiary hearing on March 5, 2013, with Father's counsel present and with Father participating by telephone from prison. Following the evidentiary hearing, on March 11, the trial court entered its order and judgment terminating Father's parental rights.

The trial court found and concluded as follows:[2]

1.　　[E.H.] is the father of [K.H.], a minor child born on September 23, 2003.
2.　　[K.H.]'s mother is [W.G.]　[W.G.] has signed consents for [K.H.] to be adopted.
3.　　A Child in Need of Services Petition "CHINS" was filed on [K.H.] on October 26, 2011, under Cause Number 49D091110JC041378 based on allegations that [E.H.] seriously injured [K.H.] due to excessive physical discipline, for which [E.H.] was incarcerated.
4.　　[K.H.] was ordered detained out of the home at the Initial Hearing held in the CHINS case on October 26, 2011.
5.　　On January 30, 2012, [K.H.] was found to be a child in need of services.
6.　　At the Disposition Hearing on January 30, 2012, [K.H.]'s continued placement was ordered outside the home and in the care of [t]he IDCSMC. He has now been removed from his father for at least six (6) months.

---

[2] K.H.'s mother has voluntarily relinquished her parental rights and consents to the adoption of K.H. by his uncle.

7.     [E.H.] remained in jail and the CHINS Court ordered him to participate in parenting education classes, stress management and anger management while incarcerated.  Upon his release he was to complete home[-]based services and follow recommendations.

8.     The Dispositional Order was modified on April 30, 2012, to include obtaining a mental health evaluation and undergo random [drug] screens.  This was to be done through his current work release program.

9.     In March of 2012, [E.H.] pled guilty to Battery as a Class B Felony and received a ten[-]year sentence, six years executed and four years suspended.

10.     [E.H.] was placed on work release through . . . Community Corrections.

11.     [E.H.] violated his work pass, failed to comply with the program, and threatened a Duval Residential Center staff member, and as a result community corrections was revoked and [E.H.] became incarcerated in the Miami Correctional Facility.

12.     [E.H.]'s current out date is in October of 2014.

13.     Prior to [E.H.]'s revocation of work release, he briefly participated with a home[-]based therapist, Jackie Carpenter-Conway.

14.     Home[-]based therapy was to address the child abuse trauma, both the extensive trauma [E.H.] experienced as well as [K.H.]'s trauma.  [E.H.] would need to process and work through his own trauma, without contact with [K.H.], and then slowly engage with [K.H.]

15.     Ms. Carpenter-Conway believed [E.H.] was in need of long[-]term therapy.  She also felt [E.H.] needed to undergo a full psychological evaluation.

16.     Due to [E.H.]'s work release being revoked, therapy was closed unsuccessful.

17.     [K.H.] has undergone therapy.  His therapist does not recommend visits with his father.

18.     [E.H.] last saw [K.H.] in October of 2011.

19.     [E.H.] is living in a therapeutic community in prison and receives some stress management and anger control counseling.  It is clear from Ms. Carpenter-Conway's testimony that intense long[-]term therapy is needed for safety purposes.

20.     [E.H.] expresses love for his son, and is remorseful regarding the excessive discipline incident.  However, by testifying that the incident was "blown out of proportion" and that "[K.H.] only stayed in the hospital overnight," he is minimizing the incident of violence.

21.     [K.H.] has been placed with the same relatives since his removal.  This placement is preadoptive.  He has been observed as having bonded with his caregivers and family; his needs are being met and he is doing well.

22.    [K.H.]'s behavior at school has changed from negative to positive since his placement in relative care.

23.    [K.H.] understands the adoption process and wishes to be adopted by his caregivers.

24.    There is a reasonable probability that the conditions that resulted in [K.H.]'s removal and continued placement outside the home will not be remedied by his father. [E.H.] will remain unavailable to parent for a while, and thereafter would have to participate in and successfully complete long term therapy.

25.    Continuation of the parent-child relationship poses a threat to [K.H.]'s well-being. [K.H.] is in need of permanency now rather than later. [E.H.] cannot offer him permanency at this time and continuation of the parent-child relationship poses as a barrier to obtaining permanency through adoption.

26.    Termination of the parent-child relationship is in the best interests of [K.H.] Termination would allow for [K.H.] to be adopted by a family he has bonded with and with whom he wishes to remain. He would then obtain the goal of living in a permanent, consistent, stable and safe environment.

27.    There exists a satisfactory plan for the future care and treatment of [K.H.], that being adoption.

28.    Based on how long [K.H.] has been out of his home, the nature of his placement, progress by his parent, and therapeutic team recommendations, [K.H.]'s Guardian ad Litem agrees that [K.H.] should stay with his caregivers and be adopted.

Appellant's App. at 11-12. This appeal ensued.

## DISCUSSION AND DECISION

We begin our review by acknowledging that "[t]he traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." Bailey v. Tippecanoe Div. of Family & Children (In re M.B.), 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), trans. denied. However, a trial court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding a termination. Schultz v. Porter Cnty. Office of Family & Children (In re K.S.), 750 N.E.2d 832, 837 (Ind. Ct. App. 2001). Termination of a

parent-child relationship is proper where a child's emotional and physical development is threatened. Id. Although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. Id. at 836.

Before an involuntary termination of parental rights can occur in Indiana, the DCS is required to allege and prove, among other things:

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

* * *

(C) [and] that termination is in the best interests of the child . . . .

Ind. Code § 31-35-2-4(b)(2).[3] That statute provides that DCS need establish only one of the requirements of subsection (b)(2)(B) before the trial court may terminate parental rights. The DCS's "burden of proof in termination of parental rights cases is one of 'clear and convincing evidence.'" R.Y. v. Ind. Dep't of Child Servs. (In re G.Y.), 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting I.C. § 31-37-14-2).

When reviewing a termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. Peterson v. Marion Cnty. Office of Family &

---

[3] Indiana Code Section 31-35-2-4(b)(2)(B) also allows the DCS to allege that "[t]he child has, on two (2) separate occasions, been adjudicated a child in need of services." But that additional, alternative provision is not relevant here.

7

Children (In re D.D.), 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), trans. denied. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. Id. Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. Judy S. v. Noble Cnty. Office of Family & Children (In re L.S.), 717 N.E.2d 204, 208 (Ind. Ct. App. 1999). trans. denied.

Here, in terminating Father's parental rights, the trial court entered specific findings of fact and conclusions thereon. When a trial court's judgment contains special findings and conclusions, we apply a two-tiered standard of review. Bester v. Lake Cnty. Office of Family & Children, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings and, second, we determine whether the findings support the judgment. Id. "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." Quillen v. Quillen, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the trial court's decision, we must affirm. In re L.S., 717 N.E.2d at 208.

Father does not challenge the trial court's findings of fact in its order terminating his parental rights. Rather, Father challenges only the court's legal conclusion that, on these facts, termination of his parental rights is justified because a continuation of the parent-child relationships poses a threat to the child's well-being.[4] Father maintains that K.H. was "doing very well" with his relative placement and that there was, therefore, no

---

[4] Father also asserts that the DCS's evidence fails to show that Father will not remedy the conditions that resulted in K.H.'s removal, but we need not consider that argument given the disjunctive nature of Indiana Code Section 31-35-2-4(b)(2)(B) and our holding that the trial court's conclusion is justified under subsection (b)(2)(B)(ii).

reason that K.H. could not have remained in that placement until Father is released from prison in October 2014. Brief of Appellant at 12. And Father contends that, "aside from the one incident" leading to K.H.'s removal in 2011, "there was no negative evidence regarding [Father]'s relationship with K.H." and there was "no evidence regarding [Father]'s parenting." Id. at 14. We cannot agree.

A trial court need not wait until a child is irreversibly influenced by a deficient lifestyle such that his physical, mental, and social growth is permanently impaired before terminating the parent-child relationship. Shupperd v. Miami Cnty. Div. of Family & Children (In re E.S.), 762 N.E.2d 1287, 1290 (Ind. Ct. App. 2002). When the evidence shows that the emotional and physical development of a child in need of services is threatened, termination of the parent-child relationship is appropriate. Id.

The evidence shows that K.H. lived with Mother[5] until his removal in December 2008, when K.H. was five years old. K.H. was then placed with Father in March 2009. A few months later, in June 2009, Father was arrested for battery against his girlfriend, and he spent six days in jail. Then, in October 2011, after Father battered K.H. with a belt and his hands, causing injuries to K.H. that required an overnight stay in the hospital, the DCS removed K.H. from Father's care. Father has not seen K.H. since his arrest. The trial court ordered that Father's visitation with K.H. was contingent on a "positive recommendation" from "the service providers." Transcript at 92. Father was unable to

---

[5] Father testified that K.H. lived with him for four years prior to his arrest in 2011, but the 2008 CHINS petition states that K.H. lived with Mother until 2008, when she had left K.H. with his grandmother and moved to Michigan; that Father had "recently got out of jail for a possession of cocaine charge"; and that Father "has not come forward to successfully demonstrate to the DCS the ability or willingness to appropriately parent his child." Petitioner's Exh. 1. Father admitted to the allegations in that petition.

participate in the services provided by the DCS after he violated the terms of his work release and was placed at the Department of Correction, and Father had not obtained the recommendation necessary for visitation with K.H. at the time of the termination hearing.

Father did not comply with the trial court's parental participation order when he had the opportunity to do so prior to his incarceration in 2012. Father did not maintain weekly contact with the case manager; he did not successfully complete home-based counseling; and he did not undergo either a mental health assessment or substance abuse assessment during his time on work release. Obviously, Father has not maintained suitable housing or a legal source of income since his incarceration in 2012.

The evidence supports the trial court's conclusion that the continuation of the parent-child relationship would pose a threat to K.H. Carpenter-Conway, Father's home-based therapist, testified that, given Father's mental health and anger issues, she would not recommend that Father have visitation with K.H., let alone custody of K.H., for a significant period of time following his release from prison. Carpenter-Conway stated that, prior to reunification, she would recommend that Father "at least be in services to process his needs for at least six to nine months prior to even contacting [K.H.] and then from there, moving in a very slow motion . . . just [for] safety reasons." Transcript at 81. Given that Father is not expected to finish his sentence until October 2014, that would mean that Father would be unable to visit with K.H. until at least April of 2015.

As Henry Momo Fahnbulleh, the DCS case manager, testified, K.H. is thriving in his foster home, and he needs permanency "now." Id. at 98. And Jamie Walden, the Guardian Ad Litem, testified that K.H. should not have to wait any longer before being

adopted because he needs "permanency and stability." Id. at 114. Father's contentions on this issue amount to a request that we reweigh the evidence, which we will not do. Again, Father does not challenge any of the trial court's findings on appeal. The evidence shows that Father has a criminal history that includes two batteries and a drug offense. It is because of Father's incarceration in 2011 that Father has not seen K.H. since that time. And, had Father not violated the terms of his work release in August 2012, he could have been participating in services and working toward reunification with K.H.

Given Father's criminal history and inability even to visit with K.H. until April 2015, at the earliest, Father cannot show that he will be able to provide adequate care or permanency for K.H. in the future. And, again, Carpenter-Conway testified that she was concerned for K.H.'s safety should Father have visitation with him. Father has not demonstrated that the trial court's conclusion that continuation of the parent-child relationship poses a threat to K.H.'s well-being is clearly erroneous. Accordingly, we agree with the trial court that the termination of Father's parental rights over K.H. was appropriate under Indiana Code Section 35-35-2-4(b)(2)(B)(ii).[6]

Affirmed.

MATHIAS, J., and BROWN, J., concur.

---

[6] Father does not challenge any of the other subsections of the termination statute.

11