# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 28 2017, 10:12 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT MOTHER

Erin L. Berger
Evansville, Indiana

ATTORNEY FOR APPELLANT FATHER

Adam J. Farrar
Van Haaften & Farrar
Mt. Vernon, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General
Indianapolis

## IN THE
# COURT OF APPEALS OF INDIANA

In the Termination of the Parent-Child Relationship of:

T.T., K.T., and L.T. (Minor Children),

S.J.-T. and K.T.,

*Appellants-Respondents,*

v.

March 28, 2017

Court of Appeals Case No.
65A04-1610-JT-2393

Appeal from the Posey Circuit Court

The Honorable James M. Redwine, Judge

Trial Court Cause Nos.
65C01-1601-JT-10,
65C01-1601-JT-11, and
65C01-1601-JT-12

Indiana Department of Child
Services,

*Appellee-Petitioner.*

**Najam, Judge.**

# Statement of the Case

S.J.-T. ("Mother") and K.T. ("Father") separately appeal[1] the trial court's termination of their parental rights over their minor children, T.T., K.T., and L.T. ("Children"). Mother raises one issue on appeal, in which Father joins, which we restate as follows: whether the trial court committed clear error when it adjudicated Children to be Children in Need of Services ("CHINS"), thereby making its subsequent termination of their parental rights also clearly erroneous. Father raises an additional issue on appeal, which we restate as follows: whether the trial court committed clear error when it terminated his parental rights rather than establishing a permanent guardianship.

We affirm.

# Facts and Procedural History

Mother and Father (collectively, "Parents") are the biological parents of T.T., born May 2, 2001; L.T., born February 8, 2010; and K.T., born March 14, 2013. On

---

[1] Father specifically "concurs and joins in the Mother's argument, including her Statement of Issue, Statement of Case, Statement of Facts, Summary of Argument, Argument, and Conclusion in her Appellant's Brief . . . ." Father's Br. at 4 n.1.

September 12, 2014, Parents placed Children with family members because Parents were concerned about their ability to provide for Children financially. On September 16, 2014, the Indiana Department of Child Services ("DCS") investigated allegations of neglect against Parents toward Children. The allegations included that the Parents' home was dirty and unsanitary; one or both Parents had a staph infection while caring for K.T., who was diagnosed with neuroblastoma cancer and had a port that needed to be kept clean and properly maintained; the Parents engaged in domestic violence in the home in the presence of Children; the Parents had untreated mental illnesses; and the Parents engaged in drug use. On October 6, Children's maternal aunt and uncle, A.H. and K. H., and Children's maternal grandparents, C.J. and R.J.,[2] (collectively, "Guardians"), filed petitions for guardianships of Children. The aunt and uncle were granted temporary guardianship over T.T. and L.T. and the grandparents were granted temporary guardianship of K.T.

On October 14, 2014, DCS filed petitions alleging Children to be CHINS. On October 21, 2014, the trial court held a hearing on the guardianship petitions and the CHINS petitions. The court granted the emergency petitions for guardianships of Children. The court also determined Children were CHINS based on Parents' ongoing domestic violence, untreated mental health issues, ongoing substance abuse, and failure to provide adequate medical treatment for Children.

---

[2] Children's maternal aunt, B.J., lives with maternal grandparents and was later added as a Guardian in the guardianship case involving K.T.

On January 25, 2016, DCS filed petitions to terminate Parents' parental rights to Children. The trial court held a termination fact-finding hearing on April 25, 26, and 27, 2016, and July 20 and 22, 2016. The termination hearing and hearing on the guardianships were consolidated by agreement of all parties. At that time, Children remained subject to the guardianships and were in the care of Guardians.

On September 21, 2016, the trial court issued a Judgment Terminating Parental Rights in which it issued the following relevant Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

[On] September 16, 2014, the Department investigated an allegation of neglect against the Mother and the Father toward their three (3) children: [T.T.]; [L.T.]; and [K.T.] (collectively the "Children").

At that time, [T.T.] was 13 years old, [L.T.] was 4 years old, and [K.T.] was one (1) year old.

The allegations included, but were not limited to the Mother and Father maintaining a dirty and unsanitary home, one (1) or both having staph infection while caring for [K.T.], who was diagnosed with neuroblastoma cancer and who had a port which needed to be kept clean and properly maintained, domestic violence in the home between the Mother and the Father[,] most of which occurred in the children's presence, mental illness, and drug use (namely[,] synthetic marijuana).

[On] September 29, 2014, the Mother filed for and obtained a Protective Order against the Father. The allegations included that the Father "smashed [the Mother's] head into the wall" and "kicked [the

Mother] in the head and back." The Mother alleged the Father then kicked her out of the home.

On the same day, the Father allegedly attempted to set the parties' house on fire.

The next day, September 30, 2014, the Father attempted to commit suicide. Officers attempted to provide assistance after they discovered blood all over the Father's vehicle. Despite the Protective Order, the Father was located at the parties' residence with the Mother.

* * *

The Children have been removed from the Mother's and Father's care and custody since October 10, 2014.

The Department determined that the Mother and Father had substantiated allegations of neglect in 2009 and 2011 as a result of domestic violence and substance abuse issues in the home. Reasonable services were provided to the Mother and Father during that time.

During the CHINS, and specifically between March, 2015 and April, 2016—while advising the Department that they would do whatever it takes to get the Children returned to them—the Mother and Father both admitted to their lack of compliance with this Court's order regarding sobriety. In fact, the Mother and Father combined admitted to substance abuse at least nine (9) times, had diluted tests at least 20 times, and failed to appear for their required testing at least 83 times during this 13 month interval.

Even since April, 2016, the parents admit to their lack of compliance with the Court's order inasmuch as the Mother admitted she used at

least two (2) times and they both admitted that they failed to appear for scheduled substance abuse testing even though the parents acknowledged it was very important to get the Children back to do so.

The Father does not have a valid driver's license. The Father admitted his driving privileges are suspended for life. Despite the Father having no license, several witnesses testified to seeing the Father drive to some of the proceedings herein.

The parents did not fully take advantage and participate in counseling. At some point, the counselor even went to the Mother's and Father's home. During at least one (1) counseling session, the Mother admitted that both the Mother and Father had a hard time maintaining basic functioning for themselves, much less for the Children.

The Mother also acknowledged that the relationship between the Mother and Father was volatile and that the counselor simply recommended that the parties separate and/or divorce.

Nevertheless, the parents remain married and did not separate during these proceedings—even with the Mother's active Protective Order against the Father.

While both parents are diagnosed with mental health impairments, they both admitted that they do not follow prescribed treatment . . . .

The parents testified that domestic violence has been long and reoccurring during their marriage. The Mother testified that it began almost immediately after the marriage began and escalated to the point that she told her counselor that she feared the Father would kill her family.

More importantly, the domestic violence was rampant in the house. [T.T.] testified that she had witnessed over 50 episodes, some of which began as verbal arguments which erupted into full physical altercations. [T.T.] testified that both parents participated in the physical altercations. During one (1) such episode, [T.T.] testified that she took [L.T.] and [K.T.] into another room to protect them. The parents would lock each other out of the house, sometimes with the Children. The parties' counselor confirmed [T.T.'s] testimony when she testified that on one (1) occasion, the Mother purposefully locked [K.T.] out of the house because she knew the Father would see her and then come back home after the Father told the Mother that he was leaving. The Court notes that the 2009 CHINS stemmed from the parties' oldest child, I.J., being injured during a domestic dispute in the home. The Father, upon cross examination, testified that the Children witnessed numerous incidents of verbal or physical altercations between the Mother and the Father throughout their lifetime and actually calculated those incid[ents] to approximate One Thousand Three Hundred and Eighty-two (1,382).

\* \* \*

[T.T.] testified that she often had to get her siblings up and ready for school because the Mother would not—even when the Mother was not working.

Most importantly, [T.T.] testified that she did not see her parents changing their behavior. She noted that despite having two (2) prior CHINS proceedings and having ample opportunity to change their behavior during this proceeding, she did not think they could permanently change their behavior to enable them to care for her siblings or her. Even more egregious, [T.T.] stated that she feared for [L.T.] and [K.T.] if returned to her parents inasmuch as she believed they would be in danger.

Ms. [B.T.], the Father's mother, who lived with the family for some time[,] testified about the verbal arguments, domestic violence, and the fact that [T.T.]—and herself—tended to the other children's needs more so than either the Mother or the Father did. She believed it would be detrimental to allow any of the Children to return to the Mother's or Father's home.

The Mother's family testified nearly the same . . . . They each believed that if the parents had not gotten the issues resolved by now that they likely never would resolve the issues . . . .

The Mother's family testified that the parents['] stability in housing, mental health treatment, substance abuse treatment, and general uncleanliness were ongoing issues for which [sic] the parents did not seem able to alleviate over the years. They each testified these issues contributed to the reasons they sought guardianship over the Children and why they do not believe the Children's best interests lie in returning them to the parents.

The family, including the Father's mother, testified that the parents simply lack the common sense and insight necessary to properly care for the Children . . . .

The Mother and Father oppose the termination . . . . Yet, they readily agree that they missed appointments with their Family Case Manager, did not attend all counseling appointments, used drugs during both CHINS matters, did not take their medicines as prescribed, failed to attend 83 drug screens, and showed diluted results for approximately 20 drug screens . . . .

The Father and Mother lack the necessary comprehension to understand the nature and effect that their arguing, fighting, substance abuse, and mental illness[es] have on the Children and their ability to properly care for the Children.

Two of the children, [L.T.] and [T.T.], are placed together in relative care with a maternal aunt and uncle. The child [K.T.] is placed with the maternal grandparents. This placement was determined to be in the best interests of the children due to the fact that [K.T.] had significant care needs based on her medical condition. [K.T.] was diagnosed with cancer in 2014 at the age of six months and needed more individualized care that the grandparents were able to provide. The relative placements are close and provide care for all the children, and they ensure sibling contact.

Each child is strongly bonded with the relatives.

Each child is doing well in the care of the current relative placements.

Department's plan for each child is that they be adopted by the current relative caregivers.

It is in the best interest[s] of each Child to be adopted due to the inability of the parents to provide appropriate care and supervision for the children.

The Department, Guardian Ad Litem, and the relative caregivers all considered the possibility of a less restrictive outcome for each child, namely that of guardianship. Due to the number of years that the parents have engaged in domestic violence, the number of years of substance use, and the long-term inconsistency, those parties do not believe that guardianship is an appropriate plan for the children. The oldest child, [T.T.], also demonstrated a desire to be adopted rather than to be the subject of a guardianship. Despite multiple interventions by the Department, a multitude of services, and informal support from family, the parents have not been able to provide a stable environment for the children during the majority of the children's lifetimes. The court finds the testimony of [T.T.] to be persuasive evidence that the potentially unsettled nature of a guardianship[] and

possibility of the parents threatening the stability of the children is not in the best interests of the children.

As the Guardian Ad Litem noted, this case is not simply a matter of having a "more permanent" plan in adoption than is available with guardianship. Each time there has been a problem in the past, the children's extended family members have stepped in to care for them. While it is a positive situation to have informal supports, this has happened on numerous occasions and has caused the children a great deal of instability. The parents in this matter have shown that they are minimally able to care for themselves, let alone for the children. Although the parents have tried for years to fully address the issues that have endangered the children, the parents have never been able to do so long term. Each time the parents have obtained some degree of stability following the Department's intervention, they have returned to prior patterns of behavior that endanger the children and put the children in the middle of violent and turbulent relationships. This is not a pattern which should continue for the children.

The Guardian Ad Litem, Ms. Hadley, testified that the parents cannot maintain simple care for themselves . . .[and] "are minimally able to take care of their own needs," much less take care of the Children's needs. Ms. Hadley testified that she did not believe the parents could[] or would permanently change their behavior to care for the Children's best interests. Rather, Ms. Hadley stated that the parents were barely able to function on their own.

CONCLUSIONS OF LAW

* * *

It is also clear and this Court is convinced from the evidence that there is a reasonable probability that the conditions that resulted in the Children's removal or the reasons for placement outside the home of

the parents will not be remedied and that there is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the Children . . . . [T]he parents exhibited habitual patterns of neglect which included[] suffering mental illness which w[ere] not fully and properly treated, failing to follow prescribed mental health treatment by failing to purchase necessary medications, weaning oneself off prescribed medications without a doctor, continuing to abuse illegal substances, continuing in a pattern of verbal and physical abuse, and continuing in a pattern of criminal conduct whereby the Father regularly drove after having his driving privileges revoked. This behavior does not include the day-to-day issues the parents suffered requiring their then 13 year old to provide caretaking duties to her then 4 year old and 1 year old siblings. As a result, [T.T.] testified that she did not feel safe and did not want to return to her parents' home. Moreover, she testified that she feared for [L.T.] and [K.T.] if they were returned to her parents['] home as she believed they would be in danger. The parents are unable to take care of their own needs, much less take care of the Children's needs. The parents also failed to complete all reasonable services provided to them by the Department, namely mental health services and substance abuse services. The Court notes that the services offered were fairly simple to follow and/or complete—i.e., appear for meetings and appear for drug screens. The parents ongoing substance abuse and domestic violence issues have not been remedied despite repeated services provided to the parents in each of the prior two (2) CHINS matters. In fact, the parents each testified that they believed the domestic violence and/or substance abuse issues were resolved after having received services in each of the cases before this one—only to have new charges filed with the exact same allegations of domestic violence and/or substance abuse.

In light of the above, the Court finds that termination is in the best interests of the Children and society.

Although termination is intended as a last resort and typically only when all other reasonable efforts have failed, the need for permanency is certainly a factor in determining whether termination is in a child's best interests. This Court considered other reasonable efforts, including a guardianship. As noted above, a temporary guardianship was granted and those proceedings were set concurrently with these proceedings to allow the parents ample time to receive and take advantage of the services offered to them by the Department. In fact, this Court would have preferred a guardianship. Unfortunately, the parents did not take advantage of the services offered to them. It has been proved by clear and convincing evidence that the guardianship was just not workable under the facts and circumstances herein.

There is a satisfactory plan for the care and treatment of the Children, namely adoption through the Guardians. It has been proven by clear and convincing evidence that termination is appropriate herein and that terminating the parent-child relationship is in the Children's best interest[s].

IT IS THEREFORE ORDERED, ADJUDGED, and DECREED that the parent-child relationship between the children, [T.T.], [L.T.], and [K.T.] and the parents, [S.J.-T.] and [K.T.], is hereby terminated.

Mother's App. Vol. II at 46-55. This appeal ensued.

# Discussion and Decision

Parents maintain that the trial court's order terminating their parental rights was clearly erroneous. We begin our review of this issue by acknowledging that "[t]he traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *Bailey v. Tippecanoe Div. of Family & Children (In re M.B.)*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans.*

*denied*.  However, a trial court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding a termination.  *Schultz v. Porter Cty. Ofc. of Family & Children (In re K.S.)*, 750 N.E.2d 832, 837 (Ind. Ct. App. 2001).  Termination of a parent-child relationship is proper where a child's emotional and physical development is threatened.  *Id.*  Although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities.  *Id.* at 836.

[8]     Before an involuntary termination of parental rights can occur in Indiana, DCS is required to allege and prove, among other things:

> (B) that one (1) of the following is true:
>
> > (i)  There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
> >
> > (ii)  There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
> >
> > (iii)  The child has, on two (2) separate occasions, been adjudicated a child in need of services.
>
> > > \* \* \*
>
> (C) [and] that termination is in the best interests of the child . . . .

Ind. Code § 31-35-2-4(b)(2) (2016). DCS need establish only one of the requirements of subsection (b)(2)(B) before the trial court may terminate parental rights. *Id*. DCS's "burden of proof in termination of parental rights cases is one of 'clear and convincing evidence.'" *R.Y. v. Ind. Dep't of Child Servs. (In re G.Y.)*, 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting I.C. § 31-37-14-2).

[9] When reviewing a termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *Peterson v. Marion Cty. Ofc. of Family & Children (In re D.D.)*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *Judy S. v. Noble Cty. Ofc. of Family & Children (In re L.S.)*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999). *trans. denied*.

[10] Here, in terminating Parents' parental rights, the trial court entered specific findings of fact and conclusions thereon. When a trial court's judgment contains special findings and conclusions, we apply a two-tiered standard of review. *Bester v. Lake Cty. Ofc. of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings and, second, we determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the trial court's decision, we must affirm. *In re L.S.*, 717 N.E.2d at 208.

Parents do not specifically challenge the trial court's findings of fact or legal conclusions. Therefore, "[t]o the extent that [they] argue[] that the trial court's findings or conclusions are clearly erroneous, [they] ha[ve] waived th[at] issue by failing to make a cogent argument." *Runkel v. Miami Cty. Dep't of Child Servs. (In re B.R.)*, 875 N.E.2d 369, 373 (Ind. Ct. App. 2007), *trans. denied*; *see* Ind. Appellate Rule 46(A)(8)(a). Rather, Parents contend that the trial court erred when it adjudicated Children to be CHINS in the first place and, therefore, the termination of their parental rights was also clearly erroneous.

Essentially, Parents argue that a court cannot find children to be CHINS when the children are under a guardianship. However, Parents cite no legal authority and make no cogent argument for such a proposition. Therefore, they waive that argument for our review. App. R. 46(A)(8)(a); *see also Pierce v. State*, 29 N.E.3d 1258, 1267 (Ind. 2015). Moreover, Parents did not challenge the CHINS allegations when they were initially made or at the termination hearing. In fact, at the July 30, 2015, permanency hearing, Parents "agree[d] that their children remain[ed] children in need of services." Mother's App. Vol. II at 16. They may not raise a challenge to the CHINS determination for the first time on appeal.[3] *See, e.g., Smith v. Marion Cty.*

---

[3] Parents cite *McKinney v. Greene Cty. Office of Family and Children (In re C.M.)*, 675 N.E.2d 1134 (Ind. Ct. App. 1997), as support for their right to challenge the CHINS adjudication for the first time on appeal. However, *In re C.M.* stands for no such proposition. Rather, in that case we held that a parent is not precluded from contesting CHINS allegations *in a subsequent termination proceeding*. *Id*. at 1138. Here, Parents were not prevented from challenging the initial CHINS allegations at the termination hearing; they merely failed to do so.

*Dep't of Public Welfare*, 635 N.E.2d 1144, 1148 (Ind. Ct. App. 1994), *trans. denied*. The challenge to the CHINS adjudication is waived.

[13] Father raises an additional issue in his appeal. He contends that, even if the CHINS adjudication is appropriate, the trial court erred in terminating parental rights rather than placing Children in permanent guardianships. In other words, he challenges the trial court's legal conclusions that termination is in Children's best interests and that the plan of adoption was a satisfactory plan. However, because he does not contend that any of the specific findings of fact are unsupported by the record, "we do not look to the evidence but only to the findings to determine whether they support the judgment." *Smith v. Miller Builders, Inc.*, 741 N.E.2d 731, 734 (Ind. Ct. App. 2000).

[14] Here, the trial court clearly considered the option of permanent guardianships and, in fact, stated its preference for such placements over termination. However, given the uncontested findings in this case, the trial court held that guardianships were unworkable and termination of parental rights and adoption by Guardians was in Children's best interests. That determination was supported by the uncontested findings that Parents had engaged in years of domestic violence, substance abuse, and inconsistency in caring for Children; Parents failed to benefit from years of offered services; neither DCS, the Guardian Ad Litem, the relative caregivers, nor the oldest child, T.T., believed Parents would ever be able to provide safe and adequate care for Children; Children needed stability and permanency; Children were doing well in their current relative placements and were strongly bonded with the relatives; and guardianships are potentially unsettled by nature and involve the

possibility of Parents threatening the stability of Children. Those findings support the trial court's conclusions that Parents' parental rights should be terminated and adoption by Guardians was a satisfactory plan. The trial court did not commit clear error.

Affirmed.

Riley, J., and Bradford, J., concur.