## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Feb 29 2016, 10:00 am

*Kevin S. Smith*

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANTS

Leanna Weissmann
Lawrenceburg, Indiana

Jeffrey E. Stratman
Aurora, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General

Abigail R. Recker
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Termination of the Parent-Child Relationship of: N.J.L., Minor Child,

N.L., Father, and T.R., Mother,

*Appellants-Respondents,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner.*

February 29, 2016

Court of Appeals Case No. 69A01-1507-JT-960

Appeal from the Ripley Circuit Court

The Honorable Ryan J. King, Judge

Trial Court Cause No. 69C01-1503-JT-2

**Najam, Judge.**

# Statement of the Case

N.L. ("Father") and T.R. ("Mother") (collectively, "the Parents") appeal the trial court's termination of their parental rights over their minor child, N.J.L. ("the Child"). The Parents each raise three issues for our review, but we address only the following two issues:

1. Whether the trial court's judgment that the conditions that resulted in the Child's removal would not be remedied was clearly erroneous; and

2. Whether the termination of the Parents' parental rights was in the Child's best interests.

We affirm.

# Facts and Procedural History

On February 13, 2013, the Indiana Department of Child Services ("DCS") filed a petition in which it alleged the Child to be a Child in Need of Services ("CHINS") after Mother threatened to kill Father and the Child. Thereafter, the trial court adjudicated the Child to be a CHINS, ordered the Child to be placed in Father's care, and ordered both Parents to participate in services. However, in December of 2013, Father left Indiana and left the Child in the care of various persons who were unable to provide appropriate care. As such, the DCS initiated a separate CHINS action to have the Child removed from Father, and the court placed the Child in the care of the State.

[4]     On March 9, 2015, DCS filed its petition to terminate the Parents' parental rights over the Child. Following a fact-finding hearing, the court entered the following findings of fact:

> 1.      On February 11, 2013, the [C]hild was removed from [Mother] because she threatened to kill the [C]hild . . . and [Father]. Mother stated she had to kill Child and Father in order to "get her wings" to heaven. On that day, Mother stated that she did not remember making these statements and she did not recall birthing a child. Mother looked at Child's baby-book to try to bring back memories of Child. DCS Family Case Manager ("FCM") Michelle Jury Sutterfield transported Mother to Community Mental Health Center ("CMHC") where she started to "come to[.]" The CMHC psychiatrist recommended that Mother not be a caregiver of the [C]hild at that time. Mother was extremely intoxicated; nearly three (3) times the legal limit. Mother had been to a bar with the [C]hild's paternal grandmother before returning to the home and making these statements . . . .

> * * *

> 5.      On April 11 . . . [b]oth Parents were ordered to (1) maintain contact with the family case manager, (2) enroll and complete all recommended services, and (3) submit to random drug screens. Mother was also ordered to (1) utilize a home-based caseworker to obtain a physician and insurance, (2) attend individual counseling to rule out mental health issues and to learn about her domestic violence behavior and follow all recommendations[,] and (3) take her prescribed medication as prescribed. Father was ordered to (1) utilize a home-based caseworker to obtain Medicaid for [the Child] and other benefits as needed, (2) complete a parenting assessment through CMHC and follow all recommendations, and (3) cooperate with First

Steps evaluation of Child and follow through with recommendations.

6.    In a May 9, 2013[,] Order, the Court found that Mother was making progress in her treatment and stability.

7.    In the same Order the Court also found Father was not making progress getting the [C]hild's Medicaid, did not complete his parenting assessment through CMHC, was not cooperating with DCS, and was not participating in case planning, periodic case reviews, dispositional reviews, placement of the [C]hild, and visitation.

8.    Mother appeared at the first periodic review hearing. Mother moved to Arizona after the first review hearing.  Father did not appear at either of the first two review hearings.  (Father continued to miss most of the period[ic] case review hearings throughout the CHINS proceedings.)

9.    [O]n August 5, 2013, the DCS filed for an Interstate Compact for the Placement of Children ("ICPC") . . . but the State of Arizona denied placement with Mother based upon Mother having "blackouts[,"] anxiety attacks, and panic attacks. (1st ICPC denial[.)]

10.    On August 10, 2013, a periodic case review was held wherein Mother appeared by phone and Father did not appear. Mother still had not engaged in mental health counseling.  Father continued his non-compliance with home-based casework, completing his parenting assessment, and get[ting] the Child on Medicaid.

\* \* \*

12. On September 5, 2013, in an Order on Period[ic] Case Review[,] the court found Father had not complied with the [C]hild's case plan by:

    a. Failing to appear to the last (2) Review Hearings.

    b. Failing to appropriately meet with his home-based caseworker.

    c. Failing to appropriately provide Skype visitations between Mother and [C]hild.

    d. Failing to complete his parenting assessment with CMHC.

    e. Failing to enroll the [C]hild in Medicaid.

* * *

14. On December 18, 2013, Child was put into DCS protective custody because Father could not be contacted and was out of state in Pennsylvania. Further, persons purporting to be baby-sitters were unable to care for the [C]hild . . . nor was there a plan for anyone else to adequately do so.

15. On or about February 27, 2014[,] . . . [t]he State of Arizona denied Indiana's [second] request for ICPC placement due to Mother's September arrest for Driving Under the Influence ("DUI") and the other members of the Arizona home being unable to care for the [C]hild due to their state of mental health. (2nd ICPC denial[.)]

16. In May 2014, Father had still not completed a Community Mental Health evaluation.

* * *

19. On February 2, 2015, the Court found that [Mother] was completing a psychological evaluation in order to try to get Arizona approval under the ICPC (3rd attempt). The Court also found that [Mother] had recently overdosed on her medication, which was likely a suicide attempt. . . .

20. On February 20, 2015, the Court found that Father was not in compliance as he had not been attending father[-] engagement services or supervised visitation with the [C]hild. Further, the Court found that Father had failed to keep a steady residence, failed to keep steady employment, and was failing to complete all recommended services.

* * *

23. A Psychological Evaluation [of Mother] was conducted in March 2015 by Dr. Raymond Edward Branton, Psy[.]D[.], L[.]P[.,] of Mesa, Arizona. . . . Dr. Branton testified . . . as follows:

* * *

1. . . . that it would be inappropriate to place the [C]hild back in [Mother's] care based on her past and present symptoms. Further, Dr. Branton state[d] that restoration of [Mother's] parental rights is not recommended at this time; related impulse control issues, questionable decision making and behaviors would have [a] significant negative impact on parenting time and possibly put [the C]hild at risk.

24.    Amanda Deardorff, CMHC, testified that Mother's Skype visitation was often compromised by:

    a.  Mother "nodding off" during the session.

    b.  Mother slurring her words.

    c.  A couple [of] times[,] Mother would cease responding/talking and she would have to cancel the visit.

    d.  It appeared to Deardorff that grandfather . . . was "controlling[.]"

25.    [Deardorff] testified that Father's visitations were complicated by:

    a.  Cancellations for work.

    b.  Lack of transportation.

    c.  Lack of stable housing.

26.    FCM Tammy Clark testified to the progress made by the Parents as follows:

    a.  Mother did not make any progress.  All progress that was made was temporary and less than meaningful.

    b.  Father has moved place of residence[] thirteen (13) times while the DCS has been involved.

c. Father tested positive for Percocet and never provided a prescription.

d. Father's visits were "very sporadic[.]"

e. In October 2014 Father "really fell off[.]" In fact, FCM Clark requested that Father call her every Monday in order to set up visitation with Child. Father NEVER called.

* * *

28. Father's sister . . . testified that while Child was placed with Father electricity was provided to the home via an electric[al] extension cord from another residence.

29. [Father] testified:

a. Transportation was a "really big issue[.]" He had lost his driver's license.

b. He had an extension cord providing electricity to the home where he and Child were staying.

c. He had a poor plan when he left for Pennsylvania leaving Child with people [who] were unable or unwilling to care for the [C]hild.

d. He failed to have a stable residence.

e. [The FCM] told him to call every Monday for visitation with Child. He NEVER called.

f.  He stated, "I wish I could be more responsible."

30.   Mother's testimony essentially disputed the conversation she had with Dr. Branton.  She believes that rendition of facts came from [another doctor's] report.  She says the "angel wings" comment occurred because she lacked her medication.  She testified that the last time she "blacked out" was February 2013.

Father's App. at 296-299, 301-02.

In light of its findings, the court concluded in relevant part:

2.   There is a reasonable probability that . . . :

a.  (1)  The conditions which resulted in [the Child's] removal and continued placement outside the home will not be remedied by the parents[:]

i.  Father's participation in services started[ ]off poor and got worse throughout the pendanc[y] of the CHINS matter.  [The] Child was initially placed with Father, but, by the end of the proceedings, Father failed to even call FCM Clark to set up visitation.

ii.  Father failed to have steady housing.  Father had approximately thirteen (13) different addresses while under the supervision of DCS.  Further, at the time of the [termination] hearing[,] Father still did not have steady housing.

iii.  Father failed to have steady transportation.  Further, this hearing had to start [one half-]hour late because Father [had] car/transportation issues.

iv. Father failed to provide electricity for the Child's home, instead running an electric[al] cord from the apartment below him.

v. The conditions that led to the Child being removed from Father have not only not been remedied, but the Court has seen these conditions deteriorate even further.

vi. As testified to by FCM Clark, and as articulated by Dr. Branton, Mother has shown no progress in dealing with her mental health issues.

vii. Throughout the pendency of the CHINS proceedings, Mother failed a drug screen for Oxycodone, committed a DUI . . . , and attempted suicide—"related impulse control issues, questionable decision-making and behaviors would have significant negative impact on parenting time and possibly put [the C]hild at risk."

\* \* \*

3. Termination of parental rights is in [the Child's] best interests for all the reasons as outlined above and specifically:

a. Father has consistently and continually failed to provide for the Child and/or follow recommendations ordered by the Court.

b. Mother's mental health and inability or unwillingness to deal with mental health issues proves that she continues to be unfit.

> c. Child has been with the foster family . . . since May 8, 2014.
>
> d. Child is flourishing with foster family.
>
> e. Child is bonded with foster family and they are willing to adopt Child.
>
> f. FCM Clark testified that . . . adoption and termination of parental rights is in Child's best interests.

*Id.* at 303-04. The court then terminated the Parents' parental rights over the Child. This appeal ensued.

## Discussion and Decision

### *Overview*

The Parents appeal the trial court's termination of their parental rights over the Child. We begin our review of this issue by acknowledging that "[t]he traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *Bailey v. Tippecanoe Div. of Family & Children (In re M.B.)*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. However, a trial court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding a termination. *Schultz v. Porter Cty. Ofc. of Family & Children (In re K.S.)*, 750 N.E.2d 832, 837 (Ind. Ct. App. 2001). Termination of a parent-child relationship is proper where a child's emotional and physical development is threatened. *Id.* Although the right to raise one's own child should not be

terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. *Id.* at 836.

[7] Before an involuntary termination of parental rights can occur in Indiana, DCS is required to allege and prove, in relevant part:

> (A) that one (1) of the following is true:
>
>> (i) The child has been removed from the parent for at least six (6) months under a dispositional decree.
>
> * * *
>
> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and

> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). That statute provides that DCS need establish only one of the requirements of subsection (b)(2)(B) before the trial court may terminate parental rights. DCS's "burden of proof in termination of parental rights cases is one of 'clear and convincing evidence.'" *R.Y. v. Ind. Dep't of Child Servs. (In re G.Y.)*, 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting I.C. § 31-37-14-2).

[8] When reviewing a termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *Peterson v. Marion Cty. Ofc. of Family & Children (In re D.D.)*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *Judy S. v. Noble Cty. Ofc. of Family & Children (In re L.S.)*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*.

[9] Here, in terminating the Parents' parental rights, the trial court entered specific findings of fact and conclusions thereon. When a trial court's judgment contains special findings and conclusions, we apply a two-tiered standard of review. *Bester v. Lake Cty. Ofc. of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings and, second, we determine whether the findings support the judgment. *Id.*

"Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the trial court's decision, we must affirm. *In re L.S.*, 717 N.E.2d at 208.

### Issue One: Whether the Conditions that Resulted in Removal Would be Remedied

[10] We first address the Parents' arguments that the DCS failed to demonstrate a reasonable probability that the conditions that resulted in the Child's removal will not be remedied. As our supreme court has explained:

> We engage in a two-step analysis to determine whether the conditions that led to the Children's placement outside the home will not be remedied. First, we must ascertain what conditions led to their placement and retention in foster care. Second, we determine whether there is a reasonable probability that those conditions will not be remedied. In making these decisions, the trial court must consider a parent's habitual pattern of conduct to determine whether there is a substantial probability of future neglect or deprivation.

*R.C. v. Ind. Dep't of Child Servs. (In re K.T.K.)*, 989 N.E.2d 1225, 1231 (Ind. 2013) (citations and quotation marks omitted).

[11] We first address Father's argument on appeal. In particular, Father asserts that, "[w]hile [he] did have the[] problems" identified by the trial court, "his struggles stemmed from poverty . . . ." Father's Br. at 14. Although we agree with Father's assertion that "[p]overty standing alone does not show unfitness to parent," Father's Br. at 15, our case law is clear that, "if the poverty causes

[Father] to neglect the needs of his children or expose his children to danger, then the children's removal is warranted." *Jones v. Gibson Cty. Div. of Family & Children (In re B.D.J.)*, 728 N.E.2d 195, 202 (Ind. Ct. App. 2000). Here, it is clear that the trial court did not base its judgment on Father's poverty alone.

[12] The reason for the Child's removal from Father's care was that he had left Indiana and left the Child with inappropriate care givers. And the record is clear that, throughout both the CHINS proceedings and the termination proceedings, Father failed to maintain stable housing. He had moved thirteen times since the DCS became involved. He was unable to maintain stable housing despite having a home-based case manager work with him for more than eight months to obtain that housing. At one point, Father had electricity at his home only because he had used an extension cord to connect his home to a nearby home. And at the termination hearing, Father still lacked a stable home. Thus, Father's habitual pattern of conduct demonstrated a substantial probability of future neglect or deprivation of the Child if the Child remained in Father's care. *See In re K.T.K.*, 989 N.E.2d at 1231. Accordingly, we cannot say that the trial court erred when it concluded that there was a reasonable probability that the reason for the Child's removal from Father's care would not be remedied.

[13] We next consider the trial court's conclusion on this issue with respect to Mother. Mother argues that the trial court's findings "are not supported by reliable evidence" and, in any event, "the evidence is that there have been no

other threats communicated by Mother" since the initial threat that resulted in the Child's removal. Mother's Br. at 12. We cannot agree.

The Child was removed from Mother's care after she had threatened Father and the Child. As a result of that behavior, Mother was ordered to undergo mental health treatment. But she repeatedly failed to either participate in those services or benefit from them. She did not progress in individual counseling. She attempted suicide and failed to fully cooperate with rehabilitative services. And she continued to demonstrate substance abuse issues throughout the CHINS and termination proceedings. Thus, as with Father, Mother's habitual pattern of conduct demonstrated a substantial probability of future neglect or deprivation of the Child if the Child remained in Mother's care. *See In re K.T.K.*, 989 N.E.2d at 1231. Accordingly, we cannot say that the trial court erred when it concluded that there was a reasonable probability that the reason for the Child's removal from Mother's care would not be remedied.

In sum, we reject the Parents' arguments on appeal. Both Parents' arguments ask this court to reweigh the evidence, which we will not do. *In re D.D.*, 804 N.E.2d at 265. We affirm the trial court's conclusion that there is a reasonable probability that the conditions that resulted in the removal of the Child will not be remedied by the Parents.

## *Issue Two: Best Interests of the Child*

Finally, both Parents assert that the trial court erred when it concluded that termination of their parental rights was in the Child's best interests. According

to the Parents, the trial court erroneously concluded that the Child would be "better off in a stable, permanent environment," which, by itself, "is not sufficient to support termination." Mother's Br. at 17; Father's Br. at 21. We reject the Parents' characterization of the trial court's judgment.

[17] We have repeatedly recognized that the testimony of the family case manager and the court appointed special advocate ("CASA"), in addition to evidence demonstrating a reasonable probability that the conditions that resulted in the removal of a child would not be remedied, "is sufficient to show by clear and convincing evidence that termination is in the child's best interest." *Stewart v. Ind. Dep't of Child Servs. (In re J.S.)*, 906 N.E.2d 226, 236 (Ind. Ct. App. 2009). Here, FCM Clark testified that termination of the Parents' parental rights was in the Child's best interests. Likewise, the CASA recommended continuing placement of the Child with the foster parents. And, as discussed above, the DCS met its burden to show a reasonable probability that the conditions that resulted in the Child's removal from the Parents would not be remedied. The trial court's conclusion that termination of the Parents' parental rights was in the Child's best interests recognizes that this evidence satisfies the DCS's burden of proof, and the Parents' arguments to the contrary are, in essence, merely requests for this court to reweigh the evidence. We will not do so. *In re D.D.*, 804 N.E.2d at 265. We affirm the trial court's judgment.

[18] Affirmed.

Riley, J., and May, J., concur.