# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

May 24 2016, 8:45 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Kristina J. Jacobucci
Newby, Lewis, Kaminski & Jones, LLP
LaPorte, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Termination of the Parent-Child Relationship of I.C., N.K., L.L., and L.L., III (Minor Children),

E.B. (Mother),

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner.*

May 24, 2016

Court of Appeals Case No. 46A03-1510-JT-1780

Appeal from the LaPorte Circuit Court

The Honorable Thomas A. Alevizos, Judge

The Honorable W. Jonathan Forker, Magistrate

Trial Court Cause Nos. 46C01-1412-JT-449, 46C01-1412-JT-450, 46C01-1412-JT-451, and 46C01-1412-JT-452

**Najam, Judge.**

# Statement of the Case

E.B. ("Mother") appeals the trial court's termination of her[1] parental rights over her minor children, I.C., N.K., L.L., and L.L., III (collectively "the Children"). Mother raises two issues for our review which we consolidate and restate as whether the trial court's termination of Mother's parental rights to the Children was clearly erroneous.

We affirm.

# Facts and Procedural History

Mother is deaf and uses American Sign Language ("ASL") to communicate. She is the mother of the following children: N.K., born July 22, 2010; I.C., born December 21, 2011; and twins L.L, III and L.L., born August 7, 2013.

On January 4, 2014, the Department of Child Services ("DCS") became involved with the Children and Mother after receiving a report alleging Mother had unstable housing with no utilities. Upon investigation, DCS discovered that Mother had made arrangements for the Children to live with her friends, C. and B., because of her inappropriate housing. Prior to DCS' investigation, Mother had signed a notarized document giving C. and B. permission to

---

[1] The parental rights of N.K.'s father, N.K., Sr., I.C.'s alleged father, D.W., or unknown alleged father, and the twins' father, L.L., Jr., were also terminated. However, they do not appeal the termination of their parental rights.

provide care for the Children until Mother found suitable housing. After its initial investigation, DCS made a determination that the Children could remain in the care of C. and B., and it did not immediately initiate Child in Need of Services ("CHINS") proceedings.

[5] Mother signed a safety plan stating that she would not remove the Children from her friends' care until meeting with DCS to discuss the matter. The initial scheduled meeting was cancelled due to weather, and DCS Family Case Manager ("FCM") Betsey Black attempted unsuccessfully to reach Mother to reschedule. DCS subsequently learned from C. and B. that Mother had been very inconsistent in communicating with C. and B. or the Children since the time she left the Children there. DCS made several more unsuccessful attempts to reach Mother. On January 22, 2014, DCS removed the Children from C. and B. because they were not legal caregivers for the Children and Mother could not be reached. Ultimately, DCS placed N.K. and I.C. in one foster home and the twins in another foster home.

[6] On January 23, 2014, DCS filed a CHINS petition as to all four children. On March 19, Mother admitted that the Children were CHINS and the trial court adjudicated them as such. The court proceeded to a dispositional hearing at which Mother was ordered to participate in supervised visitation with the Children, a parenting and family functioning assessment and all recommendations, case management services, and random drug screens. In a case review hearing on June 11, the trial court found Mother had not completed her parenting family functioning assessment, had failed her drug screens, and

was not making progress with individual counseling, but was participating in parenting education. The court suspended Mother's visitation due to her drug use and inappropriate behavior at visits. At the October 1 permanency hearing, the court approved concurrent permanency plans of adoption and reunification. At the January 23, 2015, review hearing, the court found Mother had not complied with the case plan because she had not found stable housing and had failed drug screens. In March, Mother gave birth to another child ("Baby"). At a May 2 review hearing, the court found Mother was compliant with the case plan.

[7] In the meantime, on January 7, 2015, DCS filed its petitions to termination Mother's parental rights to the Children.[2] On September 28, following a fact-finding hearing, the trial court entered the following relevant findings and conclusions[3] in support of terminating Mother's parental rights:

> 6. Further, it was established by clear and convincing evidence that the allegations of the petition are true in that:
>
>> a. The [Children have] been removed from parents for at least six (6) months under a dispositional decree of the Court, . . .
>>
>> b. There is a reasonable probability that the conditions that resulted in the [Children's] removal or the reasons for

---

[2] DCS did not file a CHINS action or take any other action as to Baby.

[3] The trial court issued four separate termination orders, one for each child. However, all four orders contained the same relevant findings; therefore, for convenience, we cite only the termination order as to I.C.

placement outside the parent's home will not be remedied, and/or there is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the [Children].

c. Termination is in the best interest of the [Children].

d. IDCS has a satisfactory plan for the care and treatment of the [Children], which is adoption.

7. In support thereof the Court makes the following findings of fact and conclusions of law:

a. On January 4, 2014, DCS received a report that the [Children] may be . . . victim[s] of abuse and neglect. Upon investigation, DCS learned that [parents] had left the [Children] in the care of friends since December 18, 2013, because they did not have appropriate, stable housing for the [C]hildren. They were living in a basement room with no heat or other utilities except an electrical extension cord which had been run down from an upstairs apartment.

b. [Parents] were to meet with DCS on January 6, 2014[,] to discuss the situation, but the meeting did not take place due to inclement weather. Thereafter, DCS unsuccessfully tried to contact them, and they did not initiate contact with DCS. As of January 14, 2014, the friends with whom the [C]hildren were staying advised that they had not heard from [parents] since DCS became involved. Then, on January 22, 2014, after still not having had contact with [parents], DCS detained the [C]hildren for their safety as they had no legal caregivers. At a detention hearing held the next day, the Court ordered that the [C]hildren be detained and placed in kinship care with the same family

friends who had been caring for them. The [C]hildren have not been returned to either [parent's] care since then.

c. [Parents] eventually contacted DCS on February 5, 2014. After they and DCS attended a Child and Family Team Meeting and a facilitation meeting, they agreed to participate in services. Based on [M]other's admission, the [C]hildren were adjudicated CHINS and a dispositional order was entered as to her on March 19, 2014. . . . The services agreed to and ordered for [parents] included random drug screens, parenting and family functioning assessment, case management services and supervised visitation.

* * *

e. Prior to the end of January, 2015 [M]other was consistently positive on her drug screens, usually for THC, but her screens have all been negative since then. As to suitable housing, if [M]other has five children in her custody, she would qualify for a subsidized, three bedroom apartment. (Four of [M]other's children are the subjects of current termination of parental rights (TPR) proceedings. Her fifth child was born in March[] 2015 and this child is in her custody and not subject to any juvenile Court proceedings.) However, there remains a concern even if [M]other obtains this housing. As noted by Family Care Manager (FCM) Black, she has a history of not having stable housing and not staying long in one place. During the pendency of the CHINS case, [M]other gave FCM Black about 6 different addresses where she was residing, and other times she had no address to report as she was homeless. This concern remains in spite of the fact that [M]other finally obtained proper identification for herself earlier this year, and which ostensibly opens up more housing opportunities for her.

f. Mother's supervised visits with [the C]hildren were also suspended after the altercation with [the twins' father] on March 27, 2014. She also was noncompliant with services for the remainder of 2014. Her visits did not resume until April 6, 2015, after she had negative drug screens and began to comply with services. The resumed visits, however, did not go well. The twins ([L.L., III and L.L.]) became irritable, but more of a concern, the two older children ([N.K. and I.C.]) exhibited increased aggression and increased behavioral problems after such visits. As a result, [M]other's visits were again suspended.

g. Mother was also referred for individual therapy, with which she was not initially compliant but recently has become more compliant and [is] making some progress. According to Amanda Jennings, [M]other's therapist since April[] 2015, [M]other has made progress in meeting with her consistently and engaging with her. However, [M]other has not made progress in dealing with her anger, and in particular, she is not implementing the coping skills she has learned in dealing with her anger toward the parenting educator.

h. Susan Lovass, a therapist from Family Focus, performed a Parenting and Family Functioning Assessment on [M]other to determine what services were needed and could be provided to [M]other. Although the referral for the assessment was made in February, 2014, [M]other's unresponsiveness led to it not being completed until October, 2014. Among other things, Ms. Lovaas recommended and the Court ordered that [M]other engage in parenting classes, undergo individual therapy and have supervised visitation with the [C]hildren. Ms. Lovaas recommended supervised visits and parenting classes as [M]other had elevated scores on the abuse scale, which is indicative of abusers. She also expressed concern that no

harm come to the [C]hildren as [M]other also scored low on the corporal punishment scale.

i. Ms. Lovaas has also been the therapist for N.K. since March, 2014, and for I.C. since August, 2014. She stated that N.K. is diagnosed with reactive attachment disorder and ADD. At times, he exhibits aggression, biting, scratching and inappropriate sexualized behavior. She did not indicate a diagnosis for I.C., but did state she will follow and mimic N.K.'s bad behaviors. She further noted that although a parent would have to deal with I.C. as well, a parent would have difficulty parenting N.K., and for mother to effectively parent him, she would have to acknowledge the existence of the problem and implement basic parenting skills. Ms. Lovaas would also not recommend changing the [C]hildren's current placement, where they have bonded well with the foster parents whom they call "mom" and "dad[."]

\* \* \*

l. Beni Miller from Dunebrook has been [M]other's parent educator since April, 2014. In order for [M]other to progress and develop appropriate parenting skills, it was necessary for her to attend parenting classes and master the skills and goals that were set for each of five levels or areas of the program to which she was assigned. This necessitated answering questions correctly and showing the ability to implement the skills learned at visitations. If the client was not successful with this, then the session(s) had to be repeated successfully before moving into the next chapter, area or level.

m. During [M]other's first year with the parenting program, [M]other made no progress. She then started to

engage in the program about the time her supervised visits were reinstated two or so months prior to the termination hearing. Mother attended 25 sessions and either was a "no-show" or otherwise missed 21 sessions. Most of the attended sessions were in the past few months. Notwithstanding that [M]other became engaged in the program, she has not mastered any program goals. She has not mastered even the beginning parenting skills, and has not used the skills she was taught. As Ms. Miller stated, [M]other needs this education, in the best interests of the [C]hildren, to understand where the [C]hildren are developmentally and how to nurture a child, which are skills [M]other does not possess. She has not learned age appropriate discipline, or what to feed the [C]hildren and how often. Instead of learning and implementing positive parenting skills, [M]other has stubbornly insisted that she knows how to parent [the C]hildren, and contrary to Ms. Miller's recommendations, she will continue to parent the [C]hildren as she sees fit. By way of example, Ms. Miller had a 2 1/2 hour session with [M]other concerning Sudden Infant Death Syndrome. Although Ms. Miller explained the dangers of having a child sleep on its stomach, [M]other replied that she would continue to have the baby sleep on its stomach because the baby liked it. Mother also does not show the ability to meet the [C]hildren's developmental and special needs; instead, she blames others for interfering with her parenting and she tends to deny that the needs exist. All of this poses a risk and concern that the [C]hildren's health and safety would be endangered if returned to mother's care.

n. Of 27 parenting sessions originally scheduled for mother, she is at a point where 22 to 23 sessions still remain. Ms. Miller indicates that [M]other has not even completed chapter one, and under the circumstances, she cannot tell how long it would take [M]other to complete

the parenting program if she continued to attend. In terms of [M]other's progress in the parenting program, Ms. Miller indicates that she is in the same place now as in April, 2014. Ms. Miller does not believe that [M]other is capable of caring for the [C]hildren on her own, and even if she had safe, stable housing it would not benefit her parenting.

o. Cheryl Highsmith, director of Harmony House, observed [M]other's supervised visits with the [C]hildren. She does not believe [M]other understands parenting or child safety issues, and she does believe that the [C]hildren would not be safe with [M]other alone. Mother does not or cannot supervise the [C]hildren, and she never saw where intervention between [M]other and the [C]hildren was not needed. When the visit supervisor or parent educator would offer her direction, [M]other instead became upset and told them they can't tell her what to do. Mother viewed the offered direction as criticism, not help. Ms. Highsmith attributes this to [M]other's attitude toward parenting education and not due to the fact that [M]other is deaf.

p. CASA believes that termination of parental rights is in the [C]hildren's best interests. She does not believe [M]other would address the [C]hildren's special needs or that [M]other grasps the gravity of what is going on with them. Her opinion would not change even if [M]other has her own apartment and had clean drug screens. She also opines that [M]other is not justified in refusing to follow direction from her parent educator.

q. Mother's testimony confirmed other witnesses' observations of the interaction between her and the parent educator, Beni Miller. Rather than receiving positive direction from Ms. Miller during visitations, [M]other

believes that Ms. Miller's efforts amounted to constant interference with her parenting of the [C]hildren. Mother's testimony also revealed and confirmed her lack of appreciation and understanding of the [C]hildren's needs. At one point she stated that she realized that N.K. has autism, but at another point she said that he basically has emotional problems like a lot of kids, so she clearly does not grasp the importance of N.K.'s special needs. Instead of referring to applying specific parenting skills which she learned to meet N.K.'s needs, she said only generally that those needs would be met by her being careful and understanding. Mother also believes that having her own apartment will help her understand parenting skills to parent five children, but instead of explaining why that is so, she responded only that it is because she was a good mother before. The Court agrees with Ms. Miller that having her own apartment will not benefit [M]other's parenting.

r. The Court finds that [M]other's deafness did not play any significant role in either the [C]hildren being adjudicated CHINS or with respect to the facts and reasons leading to the termination of parental rights proceeding.

* * *

IT IS ORDERED AND ADJUDGED that the parent-child relationship between [the Children] and . . . E.B. be terminated, . . .

Appellant's Br. at 35-46. This appeal ensued.

# Discussion and Decision

Mother maintains that the trial court's order terminating her parental rights was clearly erroneous. We begin our review of this issue by acknowledging that "[t]he traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *Bailey v. Tippecanoe Div. of Family & Children (In re M.B.)*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. However, a trial court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding a termination. *Schultz v. Porter Cnty. Ofc. of Family & Children (In re K.S.)*, 750 N.E.2d 832, 837 (Ind. Ct. App. 2001). Termination of a parent-child relationship is proper where a child's emotional and physical development is threatened. *Id.* Although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. *Id.* at 836.

Before an involuntary termination of parental rights can occur in Indiana, DCS is required to allege and prove, among other things:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services.

\* \* \*

(C) [and] that termination is in the best interests of the child . . . .

Ind. Code § 31-35-2-4(b)(2). DCS need establish only one of the requirements of subsection (b)(2)(B) before the trial court may terminate parental rights. *Id.* DCS's "burden of proof in termination of parental rights cases is one of 'clear and convincing evidence.'" *R.Y. v. Ind. Dep't of Child Servs. (In re G.Y.)*, 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting I.C. § 31-37-14-2).

[10] When reviewing a termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *Peterson v. Marion Cnty. Ofc. of Family & Children (In re D.D.)*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *Judy S. v. Noble Cnty. Ofc. of Family & Children (In re L.S.)*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999). *trans. denied*.

[11] Here, in terminating Mother's parental rights, the trial court entered specific findings of fact and conclusions thereon. When a trial court's judgment contains special findings and conclusions, we apply a two-tiered standard of review. *Bester v. Lake Cnty. Ofc. of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings and, second, we determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the trial court's decision, we must affirm. *In re L.S.*, 717 N.E.2d at 208.

[12] Mother contends that the trial court erred in concluding that she will not remedy the conditions that resulted in the Children's removal; that the continuation of the parent-child relationships poses a threat to the well-being of the Children; and that termination is in the best interests of the Children. Because Indiana Code Section 31-35-2-4(b)(2)(B) is written in the disjunctive, we only address whether the trial court erred in concluding that continuation of the parent-child relationships poses a threat to the Children and that termination is in the Children's best interests. We address each of these issues in turn.

### *Continuation of the Parent-Child Relationships*

[13] Mother contends that the trial court's finding that continuation of the parent-child relationships would pose a threat to the Children is not supported by the evidence. However, Mother's arguments are simply requests that we reweigh

the evidence, which we cannot do. *In re D.D.*, 804 N.E.2d at 265. Instead, we must determine whether the evidence most favorable to the judgment supports the trial court's conclusion. *Id.*; *Quillen*, 671 N.E.2d at 102. We hold that it does.

[14] The trial court's conclusion is supported by the following evidence. FCM Black, Court Appointed Special Advocate ("CASA") Titi Akhigbe, Parent Educator Benny Miller, and Cheryl Highsmith, the Director of Harmony House where Mother and the Children had their supervised visits, all testified that the Children have special needs that Mother has neither acknowledged nor understood. Susan Lovass, the therapist for N.K. and I.C., testified that both children have exhibited aggression and behavioral problems that became worse after visits with Mother, and Highsmith testified that Mother either did not or could not supervise the Children during visits. Black, Akhigbe, Lovass, Miller and Highsmith all testified that they do not believe Mother has the parenting skills necessary to safely care for the Children, especially those with special needs. Both Black and Miller testified that, based on Mother's lack of *any* progress in parenting classes, Mother is not able to care for any of the four Children, even if she had stable, safe housing. All of this evidence clearly supports the trial court's finding that continuation of the parent-child relationships would pose a threat to the Children.

[15] A trial court need not wait until a child is irreversibly influenced by a deficient lifestyle such that his physical, mental, and social growth is permanently impaired before terminating the parent-child relationship. *Shupperd v. Miami*

*Cnty. Div. of Family & Children (In re E.S.)*, 762 N.E.2d 1287, 1290 (Ind. Ct. App. 2002). When the evidence shows that the emotional and physical development of a child in need of services is threatened, as it does here, termination of the parent-child relationship is appropriate. *Id.*

### Best Interests

[16] In determining whether termination of parental rights is in the best interests of a child, the trial court is required to look at the totality of the evidence. *A.S. v. Ind. Dep't of Child Servs.* (*In re A.K.*), 924 N.E.2d 212, 224 (Ind. Ct. App. 2010). "A parent's historical inability to provide adequate housing, stability and supervision coupled with a current inability to provide the same will support a finding that termination of the parent-child relationship is in the child's best interests." *Castro v. State Ofc. of Family & Children*, 842 N.E.2d 367, 374 (Ind. Ct. App. 2006), *trans. denied*. "Additionally, a child's need for permanency is an important consideration in determining the best interests of a child, and the testimony of the service providers may support a finding that termination is in the child's best interests." *In re A.K.*, 924 N.E.2d at 224. Such evidence, in addition to evidence that continuation of the parent-child relationship poses a threat to the children, is sufficient to show by clear and convincing evidence that termination is in the child's best interests. *L.S. v. Ind. Dep't of Child Servs.* (*In re A.D.S.*), 987 N.E.2d 1150, 1158-59 (Ind. Ct. App. 2013), *trans. denied*.

[17] Again, Mother's contentions on this issue amount to requests that we reweigh the evidence, which we will not do. Both the FCM and CASA testified that termination of Mother's parental rights is in the Children's best interests.

Moreover, there was evidence that all four of the Children are doing well in their foster placements and could be adopted. Given that testimony, in addition to evidence that the Children need stability, supervision and care that Mother cannot provide, we hold that the totality of the evidence supports the trial court's conclusion that termination is in the Children's best interests.

[18] Although Mother contends that the trial court improperly failed to consider that her deafness played a part in her parenting time and compliance issues, there is no evidence that Mother's deafness caused her to miss more than half of the parenting classes or to refuse to acknowledge or address the Children's special needs. And her claims that her inadequate supervision of the Children during visits and her poor relationship with the parenting educator "could have been" caused by her inability to communicate without an interpreter are speculation. Appellant's Br. at 31, 32. The trial court's finding that Mother's deafness did not play any significant role in either the Children being adjudicated CHINS or with respect to the facts and reasons leading to the termination of parental rights proceedings is supported by the evidence.

[19] The trial court did not err when it terminated Mother's parental rights to the Children.

[20] Affirmed.

Robb, J., and Crone, J..