## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Sep 25 2017, 11:07 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

James A. Edgar
J. Edgar Law Offices
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Abigail R. Recker
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Termination of the Parent-Child Relationship of A.M. and D.M. (Minor Children), | September 25, 2017 |
| | Court of Appeals Case No. 49A02-1705-JT-908 |
| M.M. (Mother), | |
| *Appellant-Respondent,* | Appeal from the Marion Superior Court |
| v. | The Honorable Marilyn A. Moores, Judge |
| | The Honorable Larry E. Bradley, Magistrate |
| Indiana Department of Child Services, | Trial Court Cause Nos. 49D09-1601-JT-8 49D09-1601-JT-9 |
| *Appellee-Petitioner.* | |

**Najam, Judge.**

# Statement of the Case

M.M. ("Mother") appeals the trial court's termination of her parental rights over her minor children A.M. and D.M. (collectively "Children"). Mother raises two issues for our review, which we restate as the following:

1. Whether there was sufficient evidence to show that the continuation of the parent-child relationships would pose a threat to the well-being of the Children.

2. Whether there was sufficient evidence to establish that the termination of the parent-child relationships was in the best interests of the Children.

We affirm.

# Facts and Procedural History

Mother is the biological mother of A.M., born on November 19, 2002, and D.M., born on January 1, 2009. On April 8, 2013, Children were removed from their parents due to allegations of child abuse or neglect.[1] On April 11, the Indiana Department of Child Services ("DCS") filed a petition alleging that the Children were children in need of services ("CHINS"). On June 3, 2013, after Mother admitted that she was incarcerated and was, therefore, unavailable to parent Children, the trial court found them to be CHINS. Mother remained

---

[1] The trial court also terminated the parental rights of Father over D.M. on March 9, 2017. The record indicates that the parental rights to A.M.'s alleged father were terminated on May 16, 2016. Neither father participates in this appeal.

incarcerated throughout the CHINS proceedings and was not ordered to participate in services.[2] While incarcerated, Mother completed five programs and earned two certificates. On January 16, 2016, DCS filed a petition to terminate Mother's parental rights over the Children.

On March 8, 2017, following a hearing, the trial court granted the termination petition. In support of its order, the trial court entered the following findings of facts and conclusions:

> 1. [Mother] is the mother of [A.M.] and [D.M.], minor children being born on November 19, 2002 and January 1, 2009, respectively.
>
> * * *
>
> 3. Child in Need of Services Petitions "CHINS" were filed on [Children] on April 11, 2013, under Cause Numbers 49D09[-]1304[-]JC[-]013310 [and]-1, based on allegations that [Mother] was incarcerated and left the children with inappropriate supervision.
>
> 4. The [C]hildren were ordered detained and placed outside the home at the April 11, 2013[,] initial hearing.
>
> * * *

---

[2] At the time of the hearing, Mother's projected release date was September 2018. However, in her brief, Mother says that she expects to receive an additional time cut of three months and that she would be released in June 2018 or, potentially, March 2018. Mother states that, at a minimum, she would be eligible for work release in June 2017.

6. The [C]hildren were found to be in need of services as to [their] [M]other on June 3, 2013, after she admitted to being incarcerated and unavailable to parent.

7. Disposition for [Mother] was held on June 10, 2013.

* * *

10. The [C]hildren had been removed from their [M]other for at least six (6) months under a disposition decree prior to this termination action being filed on January 6, 2016.

* * *

12. The [C]hildren have been removed from their home and placed under the care and supervision [of] the IDCS for at least fifteen (15) of the most recent twenty-two (22) months.

* * *

18. [Mother] was incarcerated in December of 2012, and [she] has remained incarcerated throughout the CHINS case.

19. The current out date of [Mother] is currently June of 2018, and she is eligible for work release prior to that.

20. [Mother] has seen her [C]hildren three times since the incarceration, twice in 2015 and once in 2016. There is some phone contact.

21. Prior to her 2012 incarceration, [Mother] was previously incarcerated during the [C]hildren's lives. She has been convicted of at least five felonies.

22. [Mother] has completed five programs while incarcerated, receiving time cuts in her sentence.

23. [Mother] believes she has a job upon her release and, after work release, will return to live with her husband from whom the [C]hildren were originally removed. [A.M.] describes the difference between living with the pre-adoptive Brown Family as being safe and loved when compared to the time he lived with his stepfather.

24. [D.M.] was placed with his paternal aunt in October of 2014. She agrees with adopting [D.M.] rather than obtaining guardianship because she needs the adoption assistance to help raise him.

25. [D.M.] exhibited negative behavior at the beginning of placement including lying, and acting out at school and home including having outbursts.

26. Lashawna Young has been [D.M.'s] therapist for three years. Therapy goals included [D.M.] finding coping skills and positive management of his behavior.

27. [D.M.] has greatly improved in his behavior due to therapy and residing in a stable, loving, nurturing home with a caregiver who is aware of his special needs.

28. [A.M.] was placed with his brother at the paternal aunt's. He was removed due to his behavior being such that his caregiver could not meet his needs, including aggression.

29. [A.M.] has been diagnosed with Post Traumatic Stress Disorder and Oppositional Defiance Disorder.

30. Ms. Young has also been the therapist for [A.M.] for three years. His behaviors have also improved.

31. [A.M.] has been placed with his current caregivers since December of 2015. He is provided structure and stability in the home.

32. [A.M.] has had nine placements while a ward.

33. [A.M.] wants to be adopted into a forever home with the Brown Family, his current caregivers.

34. The [C]hildren's therapist believe[s] that it is critical to the [C]hildren that they receive permanency, and it would not be in their best interests to wait. Being removed from their placements where they have formed a bond could be detrimental to the [C]hildren's mental health.

35. The Court gives weight to Therapist Young who has worked with the [C]hildren for three years.

36. Both child's placements are pre-adoptive. The [C]hildren are greatly attached to their placement.

37. [Children] often visit each other, and plans are that this would continue after an adoption.

38. The [C]hildren have contact with an older sister which has become inconsistent due to some instability issues and conduct that negatively affected [A.M.].

\* \* \*

40. Continuation of the parent-child relationship[s] poses a threat to the [C]hildren's well-being; The [C]hildren are in need of permanency in the stable and caring environments in which they live, and where they have formed healthy attachments. No evidence of a real parental bond between the [C]hildren and their [M]other was given. [Mother] has been incarcerated for approximately seven of the fourteen years since [A.M.] was born and six of the ten years since [D.M.] was born. They do not need further disruption in their lives after being wards for close to four years.[3]

41. Termination of the parent-child relationship[s] is in the best interests of the [C]hildren. Termination would allow them to be adopted into stable and permanent homes where all their needs will continue to be met in therapeutic[] ways.

42. There exists a satisfactory plan for the future care and treatment of the [C]hildren, that being adoption.

43. Based on the recommendations of the [C]hildren's therapist, and based on the [C]hildren's wishes, the Guardian ad Litem recommends termination of parental rights and adoption as being in their best interests.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that the parent-child relationship[s] between [Children] and their [M]other [] is hereby terminated. The parent-child relationship between [D.M.] and his [F]ather [] is hereby terminated. All rights, powers, privileges, immunities, duties and obligations, any rights to custody, parenting time or

---

[3] The trial court did not make a determination that the conditions that resulted in Children's removal will not be remedied by Mother.

support, pertaining to the relationship are permanently terminated, including the need to consent to adoption.

Appellant's App. Vol. II at 41-43. This appeal ensued.

## Discussion and Decision

We begin our review of this appeal by acknowledging that "[t]he traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *Bailey v. Tippecanoe Div. of Family & Children (In re M.B.)*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. However, a trial court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding a termination. *Schultz v. Porter Cnty. Ofc. of Family & Children (In re K.S.)*, 750 N.E.2d 832, 837 (Ind. Ct. App. 2001). Termination of a parent-child relationship is proper where a child's emotional and physical development is threatened. *Id.* Although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. *Id.* at 836.

Before an involuntary termination of parental rights can occur in Indiana, DCS is required to allege and prove:

> (B) that one (1) of the following is true:
>
> > (i) There is a reasonable probability that the conditions that resulted in the child's removal or the

reasons for placement outside the home of the parents will not be remedied.

(ii)  There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

\* \* \*

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2) (2017).  DCS's "burden of proof in termination of parental rights cases is one of 'clear and convincing evidence.'"  *R.Y. v. Ind. Dep't of Child Servs. (In re G.Y.)*, 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting I.C. § 31-37-14-2).

[7]  When reviewing a termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses.  *Peterson v. Marion Cnty. Ofc. of Family & Children (In re D.D.)*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*.  Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment.  *Id.*  Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *Judy S. v. Noble Cnty. Ofc. of Family & Children (In re L.S.)*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*.

[8]     Here, in terminating Mother's parental rights, the trial court entered specific findings of fact and conclusions thereon. When a trial court's judgment contains special findings and conclusions, we apply a two-tiered standard of review. *Bester v. Lake Cnty. Ofc. of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings and, second, we determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the trial court's decision, we must affirm. *In re L.S.*, 717 N.E.2d at 208.

### *Issue One: Threat to the Well-Being of the Children*

[9]     Mother challenges the sufficiency of the evidence to show that there is a reasonable probability that the continuation of the parent-child relationships poses a threat to the well-being of the Children. Mother's arguments are simply a request that we reweigh the evidence, which we cannot do. Instead, we must determine whether the evidence most favorable to the judgment supports the trial court's conclusion. *Quillen*, 671 N.E.2d at 102. We hold that it does.

[10]    A trial court need not wait until a child is irreversibly influenced by a deficient lifestyle such that his physical, mental, and social growth is permanently impaired before terminating the parent-child relationship. *Shupperd v. Miami Cnty. Div. of Family & Children (In re E.S.)*, 762 N.E.2d 1287, 1290 (Ind. Ct. App. 2002). When the evidence shows that the emotional and physical development

of a child in need of services is threatened, termination of the parent-child relationship is appropriate. *Id.*

[11] Mother does not challenge the trial court's findings on this issue, and we cannot say that the trial court clearly erred when it concluded from those findings that there is a reasonable probability that continuation of the parent-child relationships poses a threat to the well-being of the Children. In addressing this issue, we note that the trial court must consider the parent's habitual patterns of conduct in order to determine the probability of future neglect or deprivation of the child. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1157 (Ind. Ct. App. 2013). The trial court may consider evidence of a parent's prior history of neglect, failure to provide support, and lack of adequate housing and employment. *Id.* DCS is not required to provide evidence ruling out all possibilities of change. *Id.* Instead, it needs to establish only that a "reasonable probability" exists that a parent's behavior will not change. *Id.*

[12] Here, the undisputed evidence shows that Children were removed from Mother's care on April 11, 2013, because of Mother's incarceration and because Mother left the Children with inappropriate supervision. The Children were found to be CHINS on June 3, 2013, after Mother admitted to her incarceration and to her unavailability to parent Children. Mother was incarcerated throughout the CHINS proceedings and was unable to maintain stable housing because of her incarceration. Mother has only visited with Children three times during her incarceration. Prior to her arrest in 2012, Mother had previously been incarcerated several times. Mother has been convicted of at least five

felonies and has been incarcerated for seven out of fourteen years of A.M.'s life and six out of ten years of D.M.'s life. Based on Mother's history of criminal activity and incarceration, there is a reasonable probability that her behavior will not change.

[13] As a result of this unstable life, D.M. acted out, lied, got in trouble at school, and had outbursts when he got angry. Similarly, as a result of the unstable life, A.M. has been diagnosed with post-traumatic stress disorder, oppositional defiant disorder, and attention deficit hyperactivity disorder. The Children's therapist and case manager believe that removing Children from their current placements would cause Children harm and would be detrimental to their mental health. Under these facts and circumstances, the trial court was well within its discretion to conclude that the continuation of the parent-child relationships posed a threat to Children's well-being.

### Issue Two: Best Interests

[14] Mother also challenges the sufficiency of the evidence to show that termination of the parent-child relationships is in the best interests of the Children. In determining whether termination of parental rights is in the best interests of a child, the trial court is required to look at the totality of the evidence. *A.S. v. Ind. Dep't. of Child Servs. (In re A.K.)*, 924 N.E.2d 212, 224 (Ind. Ct. App. 2010). "A parent's historical inability to provide adequate housing, stability and supervision coupled with a current inability to provide the same will support a finding that termination of the parent-child relationship is in the child's best interests." *Castro v. State Ofc. of Family & Children*, 842 N.E.2d 367, 374 (Ind. Ct.

App. 2006), *trans. denied*. "Additionally, a child's need for permanency is an important consideration in determining the best interests of a child, and *the testimony of the service providers may support a finding that termination is in the child's best interests*." *In re A.K.*, 924 N.E.2d at 224 (emphasis added).

[15] Mother's contentions on appeal can be summed up as follows:

> [T]he trial court's reasoning that no real bond existed between Mother and the [C]hildren is at odds with the evidence. In fact, the visitation supervisor, Sarah Kirk, testified that Mother engaged and interacted with the [C]hildren during visits. The trial court also recognized that Mother had some phone contact with the [C]hildren. FCM Shoulders' testimony on the bond between Mother and the [C]hildren shores up the fact that the court's conclusion goes against the weight of the evidence. She testified that the [C]hildren love Mother and want to maintain a relationship with her.
>
> This evidence of mutual bond and affection not only established that the [C]hildren were not in danger at the hands of continuation of parental rights, but it also implied that termination itself might pose a threat to their well-being.

Appellant's Br. at 17 (citations omitted). But, again, Mother's contentions amount to a request that we reweigh the evidence, which we cannot do.

[16] Mother testified that since June or July 2013, she has only had three visits with the Children. Young testified that stability is critical for the children and that waiting for Mother to be released from prison would not be in the Children's best interests. Likewise, Shoulders testified that DCS recommended removal of the Children from the home due to Mother's incarceration and her inability to

provide a safe and stable home to the Children, and that termination of the parent-child relationship is in the best interests of the Children. The totality of the evidence, including Mother's historical inability to provide a safe and stable home due to her history of incarceration for more than five felonies during most of Children's lives and the testimony of the Children's therapist and family case manager, supports the trial court's conclusion that termination of Mother's parental rights is in the Children's best interests.

[17] Finally, it should be noted that the Children are thriving outside of Mother's care. Young testified that D.M. is "not getting into trouble in school any longer" and "his grades have improved." Tr. at 37. Young also testified that A.M. is better able to handle his feelings and that Young no longer gets "any calls from the school or from, you know, his current placement stating that he is acting out [] and so his behavior has improved in that way." *Id.* at 43. Young attributes these changes to the stability in Children's home life. Additionally, Shoulders testified that permanency is important for the Children because "they've been in the system for quite some time" but their current placements "have been stable," the Children "feel the sense of [] security," and "the homes are loving, they're nurturing[,] and that's what each child needs." *Id*. at 115.

[18] The trial court did not err when it concluded that the continuation of the parent-child relationship would pose a threat to the well-being of the Children or when it concluded that termination of the parent-child relationships was in the best interests of the Children. Thus, the trial court did not err when it terminated Mother's parental rights as to the Children.

Affirmed.

Kirsch, J., and Brown, J., concur.