# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Sep 27 2018, 7:55 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

R. Patrick Magrath
Alcorn Sage Schwartz & Magrath, LLP
Madison, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of C.D. and S.D.;

S.C. (Mother),

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner.*

September 27, 2018

Court of Appeals Case No. 18A-JT-1293

Appeal from the Jennings Circuit Court

The Honorable Jon W. Webster, Judge

Trial Court Cause Nos.
40C01-1708-JT-25
40C01-1708-JT-26

**Najam, Judge.**

# Statement of the Case

S.C. ("Mother") appeals the trial court's termination of her parental rights over her minor children C.D. and S.D. ("the Children"). Mother presents a single issue for our review, namely, whether the Indiana Department of Child Services ("DCS") presented sufficient evidence to support the termination of her parental rights. We affirm.

# Facts and Procedural History

Mother and M.D. ("Father") are the biological parents of C.D., born on September 4, 2013, and S.D., born on December 28, 2014. On April 21, 2016, DCS became aware of allegations that Mother's boyfriend, J.P., was physically abusing C.D.; that both Mother and J.P. were neglecting the Children; and that J.P. was using heroin. At that time, DCS could not locate Father. Mother agreed to a safety plan, which kept the Children in her custody. But on April 27, DCS removed the Children from Mother's care and filed petitions alleging that each child was a child in need of services ("CHINS"). On August 24, the trial court found each of the Children to be a CHINS. One year later, on August 25, 2017, after Mother and Father had failed to fully comply with services, DCS filed petitions to terminate their parental rights over the Children.

Following a hearing, the trial court granted the petitions on April 17, 2018. In support of its order, the trial court entered the following findings and conclusions:

There is a reasonable probability that the conditions that resulted in the children's removal or the reasons for the placement outside the parent's home will not be remedied, and continuation of the parent-child relationship poses a threat to the well-being of the children, in that:

* * *

5. On April 21, 2016, the Indiana Department of child services received a report alleging the children to be victims of neglect and physical abuse with [S.C.] (hereinafter "Mother") and [J.P.], Mother's boyfriend, as the perpetrators. The allegations were specifically that the children had gotten out of the home when Mother was at work and [J.P.] was sleeping in the home; that [J.P.] whipped [C.D.] until his bottom was black and blue; that Mother did not believe [J.P.] had caused the bruises on [C.D.]; that Mother suffers from depression; and that [J.P.] uses heroin.

6. Family Case Manager (hereinafter "FCM") Kathy Toppe and Officer Richmond visited Mother and [J.P.] at their home. [J.P.] admitted to spanking both of the boys but denied leaving the bruises on [C.D.]

7. FCM Toppe asked both Mother and [J.P.] to submit to a drug screen. Both Mother and [J.P.] submitted to a drug screen. Both admitted to using marijuana but denied any other drug use.

8. Mother signed a safety plan agreeing she would not leave the children unsupervised with [J.P.] and that he would not be a caregiver for the children.

9. On April 22, 2016, a PEDS referral was made for [C.D.] Dr. Huber from Riley Hospital for Children examined photos of the bruising on [C.D.] Dr. Huber reported the bruising is consistent with the child being spanked or hit; that it is very unlikely the bruising is self-inflicted; that the bruising is very concerning and is consistent with physical abuse; and that it was recommended

that [C.D.] be seen by his pediatrician as soon as possible for a head to toe examination.

10. On April 22, 2016, both [C.D.] and [S.D.] were examined by Dr. Holly Robinson at Kings Daughters Health. Dr. Robinson reported the physical exam was very concerning for physical abuse; that the degree of bruising present would require a very significant amount of force very out of proportion to a typical spanking; that this would not result from normal 2 and a half year-old activity; and that it would be inappropriate to physically discipline the child for leaving the house at this age at all. Dr. Robinson also noted that when the nurse was taking photos of [C.D.]'s bottom, he kept touching his bruises and saying "daddy."

11. Other witnesses reported to FCM Toppe that [J.P.] was heard spanking [C.D.] and [C.D.] was screaming. Witnesses also reported the children are locked in their room often for long periods of time. One witness reported Mother was observed feeding beer to [S.D.] on New Years until he vomited, and that Mother thought it was funny. Witnesses also reported seeing Mother and [J.P.] smoking marijuana in the presence of the children.

12. On April 26, 2016, the children's maternal grandmother, [K.B.], reported to FCM Toppe that Mother came over to her home to get french fries for the boys and left the boys in the care of [J.P.] This incident occurred after Mother had signed the safety plan agreeing not to leave the boys unsupervised with [J.P.]

13. On April 26, 2016, FCM Toppe received the results of Mother's drug screen, which was negative for all substances.

14. On April 27, 2016, FCM Toppe received the results of [J.P.],s drug screen, which was positive for heroin and morphine.

15. On April 27, 2016, FCM Toppe, along with Officer Richmond, removed the children from the home due to the allegations of drug use, physical abuse and lack of supervision.

16. On April 29, 2016, the Department of Child Services filed a petition Alleging Child in Need of Services (hereinafter "CHINS") as to both [C.D.] and [S.D.]

17. A Detention Hearing and Initial Hearing was held on the same day as the filing of the CHINS petition. Mother and [J.P.] appeared at that hearing. [Father] failed to appear. Mother and [J.P.] waived their right to counsel at that hearing and denied the allegations in the CHINS petition.

* * *

19. FCM Nicholas Kirtman was assigned to this case in May 2016.

20. In May 2016, DCS made a referral to Ireland Home Based Services for Mother and [J.P.] to participate in home based casework services, to include a parenting assessment, and supervised visitation with the children.

* * *

22. In May and June 2016, DCS made referrals for Mother to participate in services through Greenbrier, including domestic violence services, individual therapy and family therapy with her mother, [K.B.] The referral for domestic violence services was due to Mother having been a victim of domestic violence at the hands of Father.

* * *

24. In August 2016, DCS referred Mother for random drug screens through Redwood Toxicology. Those drug screens were

to be collected weekly in Mother's home. Mother was also to submit to additional drug screens to be administered by FCM Kirtman at his request.

25. On August 24, 2016, a Fact Finding Hearing was held for all parties. Mother and [J.P.] appeared for that hearing. Father again failed to appear. At that hearing, Mother and [J.P.] admitted the children were in need of services based upon the allegations of physical abuse and [C.D.] sustaining bruising while in [J.P.]'s care. The Court adjudicated the children to be in need of services based upon those admissions.

* * *

28. On September 29, 2016, the Jennings circuit court held a Dispositional Hearing as to all parties. . . . Mother and Father were ordered to participate in home based counseling, a parenting assessment and successfully complete any recommendations, a substance abuse assessment and successfully complete any recommended treatment, a psychological evaluation and successfully complete any recommended treatment, and random drug screens. Mother and Father were also ordered to maintain suitable, safe and stable housing and to secure and maintain a legal and stable source of income.

29. On October 11, 2016, Mother admitted herself to the stress center at Columbus Regional Hospital, where she remained for approximately nine (9) days. During her stay there, Mother reports she participated in groups, individual therapy and medication management and that she was prescribed four (4) different medications, none of which she is currently taking. Mother's stay at the stress center coincided with the breakup of her relationship with [J.P.]

30. In October 2016, Mother's level of participation in services declined, and she started missing, cancelling or no-showing appointments with service providers.

* * *

32. On February 16, 2017, both Mother and Father tested positive for methamphetamine, amphetamine and THC.

33. On April 5, 2017, Mother tested positive for THC.

34. Mother no-showed for random drug screens on 4/10/17, 4/18/17, 4/19/17, 4/21/17, 4/24/17, 5/1/17 and 5/3/17.

35. On May 16, 2017, DCS referred Mother for a substance abuse assessment with Centerstone. Mother completed that assessment, which recommended intensive outpatient treatment.

36. On May 25, 2017, DCS referred Mother for outpatient substance abuse treatment services with Centerstone. Mother never participated in those services.

37. Mother no-showed for random drug screens on 6/19/17, 6/23/17, 6/28/17, 7/3/17, 7/6/17 and 7/10/17.

* * *

40. In July 2017, DCS referred Mother to Salvation Army Harbor Lights for a second substance abuse assessment. Mother completed that assessment, which recommended that she participate in detox services. DCS referred Mother for detox at Harbor Lights but she did not participate in that service.

41. In July 2017, DCS also referred Mother for a recovery coach through Centerstone. Mother never participated in that service.

42. In September 2017, Mother voluntarily entered the Women's Healing Place in Louisville, Kentucky. Mother testified that she completed detox at that facility, which lasted for approximately six (6) days. Mother testified she then went to a halfway house

called Women in Circle for approximately one (1) month. FCM Kirtman received some documentation from Mother's stay there but no indication that she successfully completed their program.

43. On September 11, 2017, Ireland Home Based Services unsuccessfully closed their referral for supervised visitation and home based casework services for Mother due to three (3) months of non-participation by Mother.

44. Mother testified she returned to Indiana sometime in mid-October 2017 and "bounced around" from place to place.

45. On November 1, 2017, Mother tested positive for methamphetamine and amphetamine.

46. On November 7, 2017, Mother again tested positive for methamphetamine and amphetamine.

47. On November 15, 2017, DCS referred Mother for home based casework and supervised visitation through Lifeline Youth and Family Services. That referral was assigned to Arielle Beller.

48. Mother met with Arielle Beller for only 3 case management sessions and 5 supervised visits between November 15 and December 14, 2017.

49. On November 30, 2017, the Court held a permanency Hearing at which it approved a concurrent permanency plan of adoption for the children.

50. On December 17, 2017, Mother told Ms. Beller she would be going back to the Women's Healing Place for a 30-day intensive outpatient treatment program. Lifeline Youth and Family Services closed their referral at that time.

51. On December 17, 2017, Mother again went to the Women's Healing Place in Louisville. Mother testified that she only stayed

there for approximately three (3) days and attended AA meetings and groups while she was there but did not complete a substance abuse treatment program.

52. Mother contacted FCM Kirtman when she again returned to Indiana on January 1, 2018, but was unable to provide an address of where she was staying.

\* \* \*

54. Mother testified she has recently been staying with various relatives but does not have a stable residence.

55. Mother has not had stable housing throughout her involvement with DCS and does not have stable housing at this time.

56. Mother has not completed any of the services she was ordered to complete, nor has she satisfactorily addressed her substance abuse issues.

\* \* \*

Termination is in the best interests of the children in that:

1. Parents have failed to address their substance abuse issues.

2. Parents have failed to complete any services ordered by the Court.

3. Mother has continued to lack stable housing and was unable to provide a current address at the termination hearing, admitting that she still does not have stable housing.

\* \* \*

5. Parents have not enhanced their ability to safely and appropriately parent their children and are unable to provide their children with a safe, stable and appropriate home.

6. GAL Jesseka Gibson and FCM Kirtman do not believe it would be in the children's best interest to give parents more time to complete services and attempt to reunify with their children.

The Department of Child Services has a satisfactory plan for the care and treatment of the children, which is: adoption by their maternal grandmother, [K.B.]

Appellant's App. Vol. 2 at 71-77. Thus, the court terminated both Mother's and Father's parental rights as to the Children. This appeal ensued.[1]

# Discussion and Decision

[4] We begin our review of this issue by acknowledging that "[t]he traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *Bailey v. Tippecanoe Div. of Fam. & Child. (In re M.B.)*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. However, a trial court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding a termination. *Schultz v. Porter Cty. Off. of Fam. & Child. (In re K.S.)*, 750 N.E.2d 832, 837 (Ind. Ct. App. 2001). Termination of a parent-child relationship is proper where a child's emotional and physical development is threatened. *Id.*

---

[1] Father does not participate in this appeal.

Although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. *Id.* at 836.

Before an involuntary termination of parental rights can occur in Indiana, DCS is required to allege and prove:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
> * * *
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2) (2018). DCS's "burden of proof in termination of parental rights cases is one of 'clear and convincing evidence.'" *R.Y. v. Ind. Dep't of Child Servs. (In re G.Y.)*, 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting I.C. § 31-37-14-2).

[6] When reviewing a termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *Peterson v. Marion Cty. Off. of Fam. & Child. (In re D.D.)*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *Judy S. v. Noble Cty. Off. of Fam. & Child. (In re L.S.)*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*.

[7] Here, in terminating Mother's parental rights, the trial court entered specific findings of fact and conclusions thereon. When a trial court's judgment contains special findings and conclusions, we apply a two-tiered standard of review. *Bester v. Lake Cty. Off. of Fam. & Child.*, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings and, second, we determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the trial court's decision, we must affirm. *In re L.S.*, 717 N.E.2d at 208.

[8] On appeal, Mother contends that the trial court erred when it concluded that the conditions that resulted in the Children's removal from Mother's care will not be remedied and that termination is in the Children's best interests. Mother does not challenge the trial court's conclusion that there is a reasonable

probability that the continuation of the parent-child relationships poses a threat to the well-being of the Children. Because Indiana Code Section 31-35-2-4(b)(2)(B) is written in the disjunctive, Mother's failure to challenge the second prong of that subsection means she has waived our review of the sufficiency of the evidence to support the court's conclusion on either prong.[2] Accordingly, we turn to Mother's sole remaining challenge on appeal, namely, whether the court erred when it concluded that termination is in the Children's best interests.

[9] In determining whether termination of parental rights is in the best interests of a child, the trial court is required to look at the totality of the evidence. *A.S. v. Ind. Dep't. of Child Servs. (In re A.K.)*, 924 N.E.2d 212, 224 (Ind. Ct. App. 2010). "A parent's historical inability to provide adequate housing, stability and supervision coupled with a current inability to provide the same will support a finding that termination of the parent-child relationship is in the child's best interests." *Castro v. State Off. of Fam. & Child.*, 842 N.E.2d 367, 374 (Ind. Ct. App. 2006), *trans. denied*. "Additionally, a child's need for permanency is an important consideration in determining the best interests of a child." *In re A.K.*, 924 N.E.2d at 224.

---

[2] Waiver notwithstanding, Mother does not challenge any of the trial court's findings as erroneous, and those findings clearly support the court's conclusions that the conditions that resulted in the Children's removal and the reasons for their placement outside of Mother's home will not be remedied and that there is a reasonable probability that the continuation of the parent-child relationships poses a threat to the well-being of the Children.

[10] Mother contends that termination is not in the Children's best interests because, while she did not fully comply with the parental participation order, she "gave positive [drug] screens only a handful of times," she "continued to seek help and had successfully stayed sober for more than four months," and she "recognizes her mental health needs and has personally sought out acute and long term help when necessary." Appellant's Br. at 17-19. Further, Mother maintains that the Children are "doing well in placement" with Mother's mother, K.B., who had "expressly advocated for DCS to continue reunification services." *Id.* at 19-20. Mother asserts that "[t]ermination in this case provides no extra stability, consistency, or assurance to these Children." *Id.* at 20.

[11] Mother's contentions on this issue amount to a request that we reweigh the evidence, which we cannot do. Both DCS case manager Kirtman and the Guardian ad Litem testified that termination of Mother's parental rights is in the Children's best interests. Further, the undisputed evidence shows that Mother failed to comply with the parental participation plan, including: failure to appear for eleven drug screens in 2017; positive drug screens for methamphetamine on November 1 and November 7, 2017; failure to complete a drug rehabilitation program; and failure to maintain stable housing. The Children need consistent and reliable care, and they need permanency. The totality of the evidence, including Mother's historical inability to provide a safe and stable home for the Children and her failure to address her mental health and substance abuse issues, supports the trial court's conclusion that termination of Mother's parental rights is in the Children's best interests.

Affirmed.

Crone, J., and Pyle, J., concur.